

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,020

### THE STATE OF TEXAS

### V.

### LARRY RAY SWEARINGEN, Appellee

### ON DIRECT APPEAL
### FROM THE 9th JUDICIAL DISTRICT COURT OF
### MONTGOMERY COUNTY

*Womack, J., delivered the opinion of the Court in which Keller, P.J., Meyers, Price, Keasler, Hervey, Cochran, and Alcala, JJ. joined. Johnson, J., concurred.*

The appellee, Larry Ray Swearingen, was convicted in 2000 of the capital murder of

Melissa Trotter and sentenced to death. We affirmed the judgment and sentence.[1]  He then filed

seven applications for writs of habeas corpus, which were denied. Here, the State appeals the

---

[1] *Swearingen v. State*, 101 S.W.3d 89 (2003).

decision of the trial court to grant the appellee's fourth Article 64 motion for DNA testing.[2] In this appeal, as in a prior action, the appellee has not established that biological evidence exists or that, where it does, exculpatory test results would have affected his trial. We shall reverse the trial court's order.

## Background Facts

The victim, Melissa Trotter, disappeared on December 8, 1998, after last being seen with the appellee. On December 11, 1998, the appellee was arrested on unrelated charges. On January 2, 1999, hunters found Trotter's decomposing body in the Sam Houston National Forest. The appellee was convicted of her murder primarily on circumstantial evidence. We have summarized this evidence previously:

> On the evening of December 7, 1998, two of the appellee's acquaintances, the Fosters, witnessed a phone conversation in which [the appellee] arranged for a lunch meeting with a girl at a library the following day, and the appellee then told the Fosters that the girl was Melissa Trotter, a college student from Willis.
> Three witnesses saw the appellee sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.
> Melissa's Biology teacher saw her leave the Montgomery College library with a male shortly after 1:30 p.m. that day.
> Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998.
> At 2:05 p.m. on December 8, 1998, [the appellee] called Sarah Searle and said that he was at lunch with a friend.
> Sometime around 3:00 p.m. on December 8, 1998, [the appellee's] landlord saw [the appellee's] truck leaving from behind his home.

---

[2] The State argues that (1) the trial court erred in finding that the appellee would not have been convicted if exculpatory results from this testing were available at his trial; (2) the trial court erred in ignoring our previous decision on the same issues; (3) the trial court erred by finding that the appellee had shown that "biological evidence" exists on the items he seeks to have tested; (4) the trial court erred in finding that the appellee's motion was not made to unduly delay his execution; (5) the trial court erred in finding that the evidence had been subjected to a sufficient chain of custody to show a lack of tampering; (6) the trial court erred in finding the evidence had been subjected to a chain of custody sufficient to establish its integrity; (7) the trial court erred in requiring retesting of fingernail scrapings.

At 3:03 p.m. on December 8, 1998, [the appellee] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [the appellee] driving from his home to the Sam Houston National Forest.

[The appellee's] wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingens' property was missing.

[The appellee's] wife observed Melissa's cigarettes and lighter in [the appellee's] house that evening, and those items were subsequently recovered from [the appellee's] home during the investigation.

Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in [the appellee's] car and his home on the day of her disappearance.

[The appellee] filed a burglary report falsely claiming that he had been out of town and his home was broken into on the day of Melissa's disappearance.

Between the time of Melissa's disappearance and [the appellee's] arrest, [the appellee] told two acquaintances on two different occasions that he believed police would be after him.

When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [the appellee], who claimed he did not remember the last name of the girl with whom he had met the day before.

When Mrs. Foster told [the appellee] that she recalled him saying the last name was "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead.

[The appellee] led a Sheriff's deputy on a high speed chase.

Following [the appellee's] arrest, law enforcement authorities observed and photographed red marks on [the appellee's] neck, cheek, and back.

On December 17, 1998, two neighbors of [the appellee's] mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her.

Melissa's body was discovered in an area of the Sam Houston National Forest with which [the appellee] would have been familiar from previous time spent there.

Melissa's body showed signs of significant decomposition when it was discovered in the woods 25 days after her disappearance.

The ligature found around Melissa's neck matched the remainder of a pair of pantyhose found within [the appellee's] home.

The Harris Country Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there.

The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with

the tater tots she had eaten at Montgomery College shortly before leaving with [the appellee] and the Chicken McNuggets she and [the appellee] had apparently purchased at the nearby McDonald's on the day of her disappearance.

While in jail, [the appellee] attempted to create an exculpatory letter written in Spanish in which he claimed to be someone else who had knowledge of Melissa's murder.

Within that letter, [the appellee] detailed specifics of the offense that accurately corroborated the physical and medical evidence in the case.

While in jail awaiting trial, [the appellee] told a cell mate that he had committed the capital murder and his only objective was to escape the death penalty.[3]

### Law of The Case Doctrine

The appellee is seeking to have DNA testing performed on several pieces of evidence: the pantyhose leg used to strangle the victim, the other leg of the pantyhose found at the appellee's home, four cigarette butts recovered near the victim's remains, various pieces of the victim's clothing, and scrapings from under the victim's fingernails.

In 2010, we reviewed another Article 64 motion from the appellee which requested testing of the fingernail scrapings, the ligature, and the victim's clothes (the cigarette butts were also considered in a separate, previous motion). We sustained the trial court's decision to deny testing on that motion because the appellee could not establish that any of the pieces of evidence were not tested through no fault of his own, that new technology would lead to more accurate or probative results (in regards to the evidence that had already been tested), that the evidence contained biological material, and that there was a 51% chance or higher that he would have been acquitted had any exculpatory results been available at trial.[4]

---

[3] *Swearingen v. State*, 303 S.W.3d 728, 737–38 (Tex. Cr. App. 2010).

[4] *See id.*

The State argues (among other things) that our 2010 resolution of these issues is dispositive of the appellee's current motion under the law of the case doctrine.

The "law of the case" doctrine provides that an appellate court's resolution of questions of law in a previous appeal are binding in subsequent appeals concerning the same issue.[5] In other words, when the facts and legal issues are virtually identical, they should be controlled by an appellate court's previous resolution.[6] This is a court-made doctrine designed to promote judicial consistency and efficiency.

The appellee, however, argues that since Article 64 was amended in 2011, the law has changed and he is entitled to another review of the merits.

Although the law has been amended, these amendments did not affect all of our previous determinations. In the instances where the amendment did not impact our analysis, the trial court erred by failing to adhere to our previous determinations.

## Chapter 64 Motions Generally

Chapter 64 of the Code of Criminal Procedure allows a convicted person to "submit to the convicting court a motion for forensic DNA testing of evidence containing biological material."[7] This motion may request testing of evidence that was secured in relation to the offense comprising the underlying conviction and was in the possession of the State during the trial but either was not previously tested or, although previously tested, can be tested with newer

---

[5] *Carroll v. State,* 101 S.W.3d 454, 461 n.35 (Tex. Cr. App. 2003); *Howlett v. State*, 994 S.W.2d 663, 667 (Tex. Cr. App. 1999).

[6] *Ware v. State*, 736 S.W.2d 700, 701 (Tex. Cr. App. 1987).

[7] Tex. Code Crim. Proc. art. 64.01(a-1).

techniques which can provide more accurate and probative results.[8] A convicting court may order testing if the evidence in question "(i) still exists and is in a condition making DNA testing possible; and (ii) has been subjected to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced, or altered in any material respect; and identity was or is an issue in the case."[9] Further, the convicted person has the burden of showing by a preponderance of the evidence that "the person would not have been convicted if exculpatory results had been obtained through DNA testing; and the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence…."[10]

Article 64 has changed in two major ways since the appellee's last round of DNA requests. First, the legislature added a definition of "biological material." Now, biological material means "an item in the possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence…."[11] Second, the legislature eliminated a requirement that the lack of previous testing had not been the convicted person's fault.[12]

**"Containing Biological Material"**

As a threshold matter, we address the statute's requirement that the evidence requested to be tested contain "biological material." In our previous decision, we held that the appellee had

---

[8] *Id.,* art. 64.01(b).

[9] *Id.,* art. 64.03(a)(1).

[10] *Id.,* art. 64.03(a)(2).

[11] *See* Act of May 23, 2011, 82nd Leg., R.S., § 1, 2011 Tex. Gen. Laws 366.

[12] *See ibid.*

not shown that most of the evidence he now wants tested contained biological material. The appellee's motion relies on the first legislative change (defining biological material) to support his assertion that the law of the case is not dispositive. He claims that the amendment corrected a problem with the statute that we identified in our last opinion. We stated:

> Article 64.01(a) reads in part, "A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence *containing* biological material" (emphasis added). A literal reading of the statute unequivocally mandates that all evidence to be tested must first be proven to contain biological material. When interpreting a statute, this court is limited to its plain meaning unless the language is ambiguous or its plain meaning leads to absurd results that the Legislature could not possibly have intended. Because Chapter 64 does not describe a method for determining the existence of biological material, a plain reading of the statute, as [appellee] points out, could lead to the deprivation of DNA testing in the rare case simply because of the inability to ascertain whether or not biological material exists. As an appellate court, we must give effect to the plain meaning of the statute. It is incumbent upon the Legislature, not this Court, to provide statutory means, if appropriate, for determining whether the defendant meets the burden of showing that evidence contains biological material. However, this court has held that a mere assertion or a general claim that existence of biological material is probable will fail to satisfy the [appellee's] burden.[13]

The recent amendments have not fixed this problem in most cases. No part of the amendments addresses a method for determining the existence of biological material.

In this case, the only effect the amendments had was to relieve the appellee's burden as to the fingernail scrapings. Because fingernail scrapings are now defined as biological material *per-se*, the appellee no longer needs to show that they contain biological material. However, the appellee still cannot prove the existence of biological material in the case of the ligature, the other half of the pantyhose, the cigarette butts, or the victim's clothing. The most recent

---

[13] *Swearingen,* 303 S.W.3d at 732.

amendments do not affect our previous analysis in those cases, and the law-of-the-case doctrine controls.

In support of his motion, the appellee offers the affidavit of Huma Nasir, a DNA analyst at Cellmark Forensics. He claims that even if the law has not changed, Ms. Nasr's affidavit changes the facts. Ms. Nasr's affidavit states that touch-DNA from the victim's murderer would *likely* be contained on the pantyhose ligature, the victim's clothing, and the cigarette butts. However, we have explicitly held that appellee must *prove* biological material exists and not that it is merely probable.[14] This burden was neither changed by the legislature's amendments nor met by Ms. Nasir's affidavit. Consequently, the appellee is not entitled to testing on the victim's clothing, the cigarette butts, or the ligature.

Since we have previously held that, as a matter of law, the appellee had not met his burden of proof as to the existence of biological material, and because the legislature's amendment did not alter this result except in the case of the fingernail scrapings, the trial court erred under the law of the case doctrine when it disregarded our previous holding.[15] The appellee is not entitled to testing of the ligature, the victim's clothing, or the cigarette butts.

---

[14] *See id.;Routier v. State,* 273 S.W.3d 241 (Tex. Cr. App. 2008).

[15] Because the cigarette butts were not mentioned in our published opinion, we note that, even without the law of the case doctrine, the trial court abused its discretion in finding the evidence contained biological material. The only evidence that the cigarettes contained biological material was Ms. Nasr's affidavit stating that it was "likely." Our precedent is clear that the presence of biological material must be *proven.* The appellee has not done so.

**Fingernail Scrapings**

Because of the law-of-the-case doctrine and the requirement that evidence "contain biological material," the only evidence that the appellee can show to contain biological materials are the fingernail scrapings from both of the victim's hands.[16]

As an initial matter, we must determine if the evidence the appellee is requesting (1) was obtained in relation to the underlying offense, (2) was in the possession of the State during the trial of the offense, and (3) either was not previously subjected to DNA testing or, although it was previously tested, testing could produce more accurate and probative results through newer technology. Neither party contests the first two prongs.

Before the original trial, both the scrapings from the left and right hands were examined by the Texas Department of Public Safety. It appears that some of the scrapings were tested for DNA while some were not. Given this mixed record, we shall assume without deciding that the evidence qualifies under this subsection.

In order to be entitled to DNA testing, the appellee must show by a preponderance of the evidence (51%) that he would not have been convicted if the exculpatory results were available at trial.[17] We have clarified that this requires the convicted person to show that he, more likely than not, would not have been convicted with exculpatory results. In the past, we have held

---

[16] The State also argues that the blood flecks can no longer be found, that chain of custody was not sufficient for testing any of the evidence, and that the request is made to unreasonably delay the sentence. However, since our finding is dispositive, we do not reach these other issues.

[17] *See Smith v. State*, 165 S.W.3d 361, 364 (Tex. Cr. App. 2005).

"exculpatory results" to mean only results "excluding [the convicted person] as the donor of this material ...."[18]

We are not persuaded that results showing the presence of another DNA donor in the fingernail scrapings would overcome the "mountain of evidence"[19] of the appellee's guilt. Primarily, this is because the victim's having encountered another person would not factually exclude the appellee from having killed her. There are many ways someone else's DNA could have ended up in the victim's fingernails. Such results would not require an inference that the appellee would been acquitted.

Further, before the appellee's trial, DPS analysts conducted a microscopic review of the scrapings and discovered blood flakes in the fingernail scrapings. Criminologists were able to create a full DNA profile from those blood flakes. Both the appellee and Trotter were excluded as contributors of the blood. These results were available at trial and presented to the jury. Since the jury already was aware that an unidentified male's DNA was found under the victim's fingernails, we fail to see how other such results would have changed its verdict. The jury chose to believe that the foreign DNA either was contamination or that it came from outside the context of the crime. If the jury already knew of exculpatory results obtained from under the victim's nails and disregarded them, we have no reason to believe that it would be any different with regards to the remainder of the fingernail scrapings. As to the blood itself, the appellee cannot show that new testing would lead to a different result.

---

[18] *Blacklock v. State*, 235 S.W.3d 231, 232 (Tex. Cr. App. 2007).

[19] *Swearingen,* 303 S.W.3d at 736.

The appellee argues that because the legislature's amendment requires DNA results to be run through CODIS (Combined DNA Index System), we should now construe an "exculpatory result" to mean DNA results that are not from the convicted person and which generate a CODIS hit. The appellee's argument goes too far.

A requirement to assume that the results of testing were not only from someone other than the convicted person but that the other person was a repeat offender (or as the appellee argued before this court, a repeat offender with a similar modus operandi), makes it hard to imagine a case in which we would not grant DNA testing. Such compelling DNA results would certainly overcome any mountain of inculpatory evidence. We believe that had the legislature meant to so drastically lower the barrier for Chapter 64 testing, they would have said so explicitly. The statute requires only that the results be run through CODIS. It does not set a standard for exculpatory results.

## Conclusion

We reverse the order of the trial court and remand for proceedings in accordance with this opinion.

Delivered February 5, 2014.
Publish.