

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00366-CR

ROGER EUGENE FAIN                                                                APPELLANT

V.

THE STATE OF TEXAS                                                                        STATE

----------

## FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1023944D

----------

## MEMORANDUM OPINION[1]

----------

In one point, Appellant Roger Eugene Fain appeals the trial court's order denying his second motion for forensic DNA testing of evidence related to his capital murder conviction.[2] Because we conclude that the trial court erred by

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Code Crim. Proc. Ann. art. 64.05 (West 2006); Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2014).

denying the motion, we reverse the trial court's order and remand this case for a

new hearing.

**Background Facts**

This is not Appellant's first proceeding in this court.  In affirming his 2007

conviction and life sentence for capital murder,[3] we provided details related to the

murder of Linda Donahew:

> Bonnie Bishop shared a house with her sister, Donahew.  On June 1, 1987, Bishop left work and arrived home at approximately 8:00 p.m.  She entered the house to find her sister's nude and blood-covered body lying on the floor in the bedroom closet.
>
> The autopsy revealed that Donahew had died from manual strangulation and that a secondary cause of death was a stab wound to her neck.  The postmortem examination also revealed several hairs found clinched in her hands, DNA artifacts in her mouth, and three foreign pubic hairs in the genital area.
>
> Approximately fourteen years later, in August 2001, a DNA sample was taken from Appellant, who was incarcerated for an unrelated crime.  The sample was entered into the Combined DNA Index System (CODIS) of the Texas Department of Public Safety (DPS).  Four years later, in October 2005, the cold case of Donahew's murder was reopened, and the DNA samples acquired during the examination of her body were uploaded into CODIS and were found to match the DNA profile of Appellant.
>
> . . . At trial, the State relied on the DNA evidence, testimony from a witness who saw a truck similar to that owned by Appellant at the time of the offense parked in front of Donahew's house at the time of the offense, the testimony of an inmate, Danny Smith, who claimed that Appellant had confessed to him in jail, testimony that

---

[3]*Fain v. State*, No. 02-08-00002-CR, 2009 WL 2579580, at \*1, 9 (Tex. App.—Fort Worth Aug. 20, 2009, pet ref'd) (mem. op., not designed for publication).

2

Donahew had previously been seen in the company of Appellant, and testimony that on the day of her death she had said that she was worried about meeting someone who wanted to look at a truck she was selling.

Dr. Nizam Peerwani, the medical examiner who performed the autopsy and forensic examination of Donahew's body, testified that he took oral swabs from her mouth and that they contained DNA material. . . . Kelly Solis testified that she was a DNA analyst for the DPS CODIS lab . . . . She testified that the DNA samples from the oral swabs taken by Dr. Peerwani matched Appellant's DNA profile.

Constance Patton testified that she was a senior forensic biologist and DNA technical leader for the medical examiner's office crime laboratory in Fort Worth. She testified that she had examined the samples from the oral swabs taken by Dr. Peerwani and that the results of her examination showed that the samples contained DNA material consistent with the DNA of Donahew and a mixture containing one DNA sample consistent with that of Appellant and a sample of male DNA foreign to both Donahew and Appellant. Patton testified that it could not be determined whether Appellant's DNA had been contributed before or after the other male DNA or how long it had been present. She also testified that she had tested a portion of a towel taken from Donahew's house. The towel tested presumptively for blood and also for a mixture of DNA from Donahew. She testified that a sample of male DNA from Ronald Nix, a boyfriend of Donahew, could not be excluded from matching the sample on the towel. Patton also found a sperm stain on the comforter from Donahew's bed, the DNA profile of which also matched Nix's sample.

. . . .

Detective Jim Ford testified that he had requested DNA testing of [an] unknown pubic hair found on Donahew's body. The test showed that Nix could not be eliminated as a contributor of the hair.

. . . .

Ernest Fain, Appellant's brother, testified that in 1987, Appellant drove a mid–1970s white Ford pickup truck and that the truck had a black tool box and PVC piping attached to its bed. . . .

3

Sheila Nelson testified that she lived next door to Donahew in 1987 . . . [and] [o]n the day of Donahew's murder, Nelson and her husband left the house at approximately 5:15 p.m. to take a walk. They noticed a white Ford pickup truck parked on the street . . . between [Nelson's and Donahew's houses]. She testified that it was an older model truck with a tool box. The truck was still there when she returned from her walk about fifteen to twenty minutes later. . . .

. . . .

Michael Higham testified that in the late spring and summer of 1987, he was the detail shop manager of Pleasant Ridge Car Wash in Arlington. In the late spring or early summer of 1987, Donahew took her car in for detailing. When he had finished with the car, he went to the horse stables to pick her up and take her back to her car. She was with a man whom he identified as Appellant. . . .

. . . .

Danny Smith, a sixty-three-year-old inmate who at the time of trial was serving forty-five years' confinement for involuntary manslaughter, . . . testified that he knew Appellant from having been in prison with him. . . . Appellant told Smith that he had been having sex with Donahew and had unintentionally strangled her during sex. . . .

. . . .

. . . Smith testified that Appellant had shared news articles from newspapers and from the internet about the Donahew murder case.

Ronald Nix testified that he had dated Donahew from February 1987 until her death. . . . He testified that shortly before her death, he had been at a club with Donahew and had seen her talking with a man whom Nix identified as Appellant.[4]

In the appeal from his conviction, we rejected Appellant's argument that

the evidence was legally and factually insufficient to show that he committed the

--------

[4]*Id.* at *1–4 (internal quotation marks omitted).

murder, although we noted that the evidence was "equivocal."[5]   Indeed, the

evidence against Appellant was far from overwhelming.  As we noted,

> Smith admitted that he was worried about the possibility of dying in prison and that he had lost various appeals in his case, up to and including his appeals in federal court and the United States Supreme Court.  He also admitted that he had made contact with the Tarrant County District Attorney's office regarding testifying against Appellant, calling himself a "crucial State's witness" and offering his testimony in exchange for benefits to him, including help with his sentence.  He testified that he had wanted a guarantee in writing of help "in this and possibly other offenses currently unsolved."   He also admitted to having offered himself as a State's witness in other cases.  In exchange, he had asked to be removed from his current prison unit and placed in a unit with better medical facilities.  He also admitted that he had, in fact, been moved to a geriatric medical facility in the Terrell Unit.

> Smith testified that when he was interviewed by Appellant's trial counsel, he had told them that he did not know why he had been brought to Tarrant County and that he did not have any information that would help the State regarding Appellant's alleged killing of Donahew.   Smith also denied knowing that one of Appellant's attorneys was, in fact, an attorney.   Later, however, Smith admitted that he had previously written to the same attorney requesting help in his case.[6]

Additionally,

> Donald Thweatt testified that in 1987 he owned two horses, which he stabled at Braddock's Stables in Arlington.  Around June 1, 1987, he saw Donahew, who also kept horses there, at the stables.  She was not driving her usual vehicle but was with a male in a 1970s white Ford pickup.  He described the man as being about six feet tall and weighing around 180 pounds with shoulder-length hair and glasses.  On cross examination, Thweatt said that Donahew and the

---

[5]*Id.* at *5.

[6]*Id.* at *4.

man were unloading clear plastic bags of cedar shavings. He also described the man as having an untrimmed and unkempt beard. Thweatt testified that he could not remember the exact date, but that it was "sometime in the late spring of 1987."

. . . .

Ronald Nix testified that . . . [i]n May 1987, he and Donahew had taken a vacation together to Mexico. A picture taken at the time of the trip showed that in May 1987, Nix had dark, curly hair and wore a full beard.[7]

Other testimony noted in our original opinion included the following:

Luke Kortegast, who testified by videotaped deposition because he was on active duty in the military and scheduled to be deployed overseas, testified that at the time of the offense, when he was seventeen years old, he lived with his parents next door to Donahew, whom he described as attractive. He often saw a white pickup truck parked at Donahew's house from the winter of 1986 through the early spring of 1987. He described the truck as a mid-to-late 1970s white pickup truck with large tires and a raised suspension. He thought that it was a four-wheel drive truck and in "pretty good shape." He testified that on occasion the truck had been at the house overnight. He did not remember the truck[']s having a toolbox or a PVC pipe attached to its bed.

He described the driver as a white male, approximately six feet tall and weighing between 175 and 200 pounds, with long dark brown hair and a beard that ranged from a few days' stubble to a full beard. Kortegast testified that the man usually wore a baseball cap and aviator-type sunglasses.

At some point in the spring, Kortegast stopped seeing the truck at Donahew's house, but he testified that he did see it parked in the driveway one more time on the day of Donahew's murder. He testified that the truck was in the driveway at approximately 10:30 a.m. the day of her death. He was unable to identify Appellant as the driver of the truck, either at trial or from a photo spread. Kortegast also testified that Donahew had frequent visitors in

---

[7]*Id.* at *3–4.

addition to the bearded man.

> . . . Appellant's brother [Ernest], . . . described [Appellant's truck] as a standard truck, not a raised four-wheel-drive vehicle. He also testified that he had seen Appellant approximately a dozen times during 1986 and 1987 and that he had never known Appellant to have a beard. He also testified that the pickup was "very beat up."

> . . . . [After their walk, Nelson] and her husband went out to eat, and when they returned at about 8:30 p.m., the pickup was gone. Nelson testified that Donahew had had a lot of friends and quite a bit of company.

> Bishop, Donahew's sister, testified that in November 2005 she had been shown a photo spread containing Appellant's photograph. After looking at it for approximately twenty minutes, she had told Detective Ford that she did not recognize anyone in it. After the photo array was shown to her other sister, however, Bishop asked to see it again, and she then told Ford that it looked like someone who had come up to Donahew in a restaurant and bar called John B's. Bishop also testified that Donahew had broken up with Nix some time before her death.[8]

Although Higham identified Appellant as the man he saw with Donahew at the stables, he told Arlington police officer William Zimmerman that he had talked to Mrs. Braddock for a few minutes "until Donahew arrived with a white male who was driving a pale blue 1973 or 1974 pickup truck with wide spoked wheels."[9]

The only evidence that Appellant strangled Donahew is Smith's testimony of Appellant's purported confession of consensual sexual activity with consensual autoerotic choking that accidentally resulted in strangling. But there is no

---

[8]*Id.* at *2–3.

[9]*Id.* at *4.

evidence of Appellant's using a knife, although Donahew was also fatally stabbed. Additionally, we noted in our original opinion,

> Linda Reed testified that Donahew was a close friend and had come to her house for a visit around 11:00 a.m. on the day she died. Donahew left around 3:00 p.m. that afternoon, and as she left, she told Reed that she was nervous because later she was going to show her pickup truck to a man she had met at the stables and that he might buy it from her. Reed testified that Donahew had a bad feeling about the meeting.[10]

Following our opinion affirming the conviction, Appellant filed his first motion for postconviction forensic DNA testing, and in September 2010, the trial court denied that motion.[11] In 2012, we affirmed the order denying Appellant's first motion.[12] We explained, in part, that the trial court did not err by denying Appellant's motion to test several items—including six head hairs clenched in Donahew's hands, loose pubic hairs combed from Donahew's pubic hair, blood on a water knob of a bathroom faucet, Donahew's fingernail clippings, male DNA discovered on the bra and shirt Donahew wore on the day of her death, and a knife, because as to those items, Appellant failed to establish "no fault" in the items not being previously tested.[13]

---

[10]*Id.* at *8.

[11]*Fain v. State*, No. 02-10-00412-CR, 2012 WL 752652, at *1 (Tex. App.—Fort Worth Mar. 8, 2012, pet. ref'd) (*Fain II*).

[12]*Id.* at *21.

[13]*Id.* at *5–18.

8

In April 2013, Appellant acting *pro se*, filed his second motion for post-conviction DNA testing of items that "ha[d] not previously been tested." Specifically, he asked for testing of, among other items, hairs from Donahew's hands, from a comforter, and from a shirt; pubic hairs from the autopsy; fibers from Donahew's body; blood samples from carpet, from a faucet, and from a ball point pen; and a comb from a bathroom floor. Appellant contended, "There is untested biological material in the State's possession that may well contain the identity of the person(s) that are responsible, but has never been subjected to DNA testing." He also averred, "If DNA other than [Appellant's] is detected, [that] could corroborate the theory of someone else[']s involvement in this case . . . ."

The State confirmed that "evidence exists which may contain biological material" but contended that probative DNA evidence found on Donahew inculpated Appellant. After the State responded to Appellant's second motion, in June 2013, the trial court denied the second motion because Appellant did not meet the requirements of either article 64.01 or article 64.03 of the code of criminal procedure.[14] The trial court adopted the State's proposed findings of fact and conclusions of law, as follows:

---

[14]*See* Tex. Code Crim. Proc. Ann. arts. 64.01, 64.03 (West Supp. 2014).

## FINDINGS OF FACT

. . . .

5. Oral swabs taken from Linda Donahew's mouth during the post-mortem sexual assault examination contained semen from an unknown individual. . . .

6. On October, 14, 2005, the Tarrant County Medical Examiner's Office conducted STR DNA testing on the oral swab. . . .

. . . .

8. The STR profile for the sperm fraction contained a mixture of two individuals—Ms. Donahew and an unknown contributor. . . .

9. On October 18, 2005, the Texas Department of Public Safety CODIS Laboratory ran a routine DNA database search which identified a match between the oral swab's unknown male contributor and [Appellant's] previously submitted DNA specimen. . . .

10. On December 19, 2005, the Tarrant County Medical Examiner's Office conducted STR DNA testing on a saliva swab taken from [Appellant]. . . .

11. The DNA analyst concluded that [Appellant] cannot be excluded as the contributor of the male component of the sperm fraction mixture. . . .

12. The DNA analyst calculated that at least 99.999% of the Caucasian, African-American, and Southwestern Hispanic populations can be excluded as a possible contributor to the sperm fraction mixture. . . .

13. [Appellant] cannot be excluded as the contributor of the most significant biological evidence—the semen found in Ms. Donahew's mouth.

14. Given the previously-tested DNA evidence inculpating [Appellant] and its high-probative value, it is unlikely that newer testing of this evidence or any other evidence would provide results which would exonerate him.

15. [Appellant] does not meet the article 64.01 requirements for post-conviction forensic DNA testing.

16. [Appellant] does not meet the article 64.03 requirements for post-conviction forensic DNA testing.

<u>CONCLUSIONS OF LAW</u>

. . . .

3. It is unlikely that newer testing of this evidence or any other evidence would provide results which would exonerate [Appellant]. . . .

. . . .

5. A convicted person must establish that there exists a reasonable probability that exculpatory DNA testing of the evidence for which he seeks testing would prove his innocence. . . .

6. Given the previously-tested DNA evidence inculpating [Appellant] and its high-probative value, it is unlikely that newer testing of this evidence or any other evidence would provide results which would exonerate him.

Appellant brought this appeal.

**The Denial of Appellant's Motion**

We review the trial court's denial of a motion for DNA testing of biological material under a bifurcated standard.[15] We afford almost total deference to a trial court's determination of issues of historical fact, but we review de novo the trial court's applications of the law to facts as long as those applications do not turn

---

[15] *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002), *cert. denied*, 539 U.S. 978 (2003).

on credibility and demeanor of witnesses.[16] The trial court did not receive live testimony on Appellant's second motion for DNA testing; we do not have a reporter's record related to the motion.

Chapter 64 of the code of criminal procedure allows a convicted person to file a motion for forensic DNA testing of evidence containing biological material.[17] Such a motion must be accompanied by an affidavit that is sworn to by the convicted person and that contains facts in support of the motion.[18] The biological material to be tested must have either not been previously tested, or if previously tested, the convicted person must show that "newer testing techniques . . . provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test."[19]

The trial court may order DNA testing of biological material only when identity was an issue in the case and the convicted person proves by a preponderance of the evidence that a conviction would not have occurred if exculpatory results had been obtained through testing of the material in

---

[16]*Id.*; *see Harbour v. State*, No. 02-10-00558-CR, 2011 WL 3795256, at *1 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op., not designated for publication).

[17]*See* Tex. Code Crim. Proc. Ann. art 64.01(a)(1), (a-1); *State v. Swearingen*, 424 S.W.3d 32, 36 (Tex. Crim. App. 2014).

[18]Tex. Code Crim. Proc. Ann. art. 64.01(a-1).

[19]*Id.* art. 64.01(b); *see Swearingen*, 424 S.W.3d at 36.

question.[20]  Evidence that could establish the possibility of another DNA contributor to the scene of the crime does not meet this requirement when significant evidence supports the defendant's guilt.[21]

But in the case now before this court, the evidence of Appellant's guilt was far from overwhelming.  His identity as the killer was hotly contested.  DNA of both Appellant and an unknown male was found at the scene and inside Donahew's mouth.  But there was no way to determine when the DNA was deposited or in what order it was deposited.  DNA of Nix was also found.  A truck was seen outside Donahew's home on the day of her death, but the truck was not definitively connected to a specific person.  The only evidence of Appellant's killing Donahew was the purchased and suspect testimony of Smith that Appellant had confessed to engaging in consensual sexual activity with Donahew and accidentally strangling her.  The medical testimony, however, described a fatal stab wound inflicted on Donahew while she was still alive.  It was described

---

[20]Tex. Code Crim. Proc. Ann. art. 64.03(a)(1)(B), (2)(A); *Swearingen*, 424 S.W.3d at 38 ("In order to be entitled to DNA testing, the [movant] must show by a preponderance of the evidence (51%) that he would not have been convicted if the exculpatory results were available at trial."); *Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011).

[21]*See Swearingen*, 424 S.W.3d at 38 (noting that when there is a "mountain of evidence" against the defendant, proof of another DNA contributor at the scene is not enough to exonerate him); *Qadir v. State*, No. 02-13-00308-CR, 2014 WL 1389545, at *4 (Tex. App.—Fort Worth Apr. 10, 2014, no. pet.).

as a wound intended to cause her death. Even Smith's testimony did not mention a knife.

Importantly, there was testimony that Donahew was concerned about an appointment to show her pickup truck to a man she had met at the stables who had said he might buy it from her. Nix had testified that he was at a club with Donahew shortly before her death and had seen her talking with a man whom Nix identified as Appellant. Nix testified that Donahew had given Appellant her phone number. This is not evidence that Appellant was the man Donahew had met at the stables, although neither is it evidence that she did not meet him originally at the stables.

We upheld the denial of Appellant's first request for DNA testing because he did not sustain his burden under the former law to show that he was blameless in the failure to perform the DNA tests before the trial.[22] The law has changed since the first request, and Appellant no longer bears that burden. The material Appellant asks to have tested in his second motion meets the requirements of the current articles 64.01 and 64.03 of the code of criminal procedure. Article 64.03 provides,

> (a) A convicting court may order forensic DNA testing under this chapter only if:
>
> (1) the court finds that:

---

[22] *Fain II*, 2012 WL 752652, at *18.

14

(A)    the evidence:

(i) still exists and is in a condition making DNA testing possible; and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;  and

(B)    identity was or is an issue in the case; and

(2)    the convicted person establishes by a preponderance of the evidence that:

(A) the person would not have been convicted if exculpatory results had been obtained through DNA testing; and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

. . . .

(c) If the convicting court finds in the affirmative the issues listed in Subsection (a)(1) and the convicted person meets the requirements of Subsection (a)(2), the court shall order that the requested forensic DNA testing be conducted.[23]

Among the items that Appellant asks to be tested are untested hairs clutched in Donahew's hand and pubic hair found in her pubic area.  One of the hairs in her hand was identified as dog hair.  Other hairs from her hand were consistent with either the hair of Donahew or that of her sister, Bishop.  One hair from her hand, however, was not matched to Donahew, Bishop, or Appellant.  Logic dictates a probability that the hair clutched in her hand is that of her killer.

---

[23]Tex. Code Crim. Proc. Ann. art. 64.03.

15

There is no suggestion of multiple assailants. Indeed, the evidence indicates a single assailant. As for the blood on the bathroom faucet handle, the medical examiner tied the only bleeding wound directly to Donahew's death. The blood was never tested, although it is possible to test the blood to determine whether it was contributed by a single person or whether the blood contains DNA from more than one donor.

Identity of the killer, as opposed to sexual partner, was hotly contested. Three men contributed DNA. Two men contributed DNA found in the oral swabs, Appellant and an unknown male, although the evidence supports a determination that there was a single assailant. Oral swabs taken by Dr. Peerwani showed that the samples contained DNA material consistent with the DNA of Donahew and a mixture containing one DNA sample consistent with that of the Appellant and a sample of male DNA foreign to both Donahew and Appellant. Although Donahew was strangled, and the strangulation was a cause of death, Dr. Peerwani testified that the knife wound to Donahew's neck was intended to cause her death.

Evidence that exculpates the innocent and ties the guilty to Donahew at the time of her death cannot be held to merely "muddy the waters." If the contributor of the untested hair in Donahew's hands is identified, for the first time in this case, we would know whether Nix, Appellant, or the unidentified male was with Donahew at the time of her death when she pulled hairs from his head. Additionally, identifying DNA other than Donahew's in the blood on the bathroom

16

faucet handle would be compelling evidence of the identity of the assailant, since the bleeding neck injury necessarily connects to Donahew's death.

The Texas Court of Criminal Appeals instructs us that

[t]he legislature's decision to broaden the scope of appeals to the courts of appeals is a significant factor in assessing the authority of those courts to review the article 64.04 findings.

We think that the courts of appeals have been given authority to consider the sufficiency of the evidence as well as other grounds of appeal. The only limit that the statute placed on those courts was that they would not have jurisdiction of DNA-testing appeals in death-penalty cases.[24]

It is unlikely that a jury would have convicted Appellant of Donahew's murder had evidence that the DNA recovered from the hair clutched in Donahew's hands or from the blood on the faucet excluded Appellant as the donor. Dr. Peerwani testified that the assailant inflicted the knife wound on Donahew's neck for the purpose of causing her death. Discovering the donor of DNA mixed with Donahew's blood on the knife would be compelling evidence of guilt in causing Donahew's death. The presence of DNA other than Appellant's would compellingly exculpate Appellant.

There is no way to tell from the record whether the blood on the Bic pen and in the closet was deposited in connection with Donahew's death. We therefore overrule Appellant's issue as to those items. But the trial court erred by denying Appellant's request for DNA testing of the hairs in Donahew's hands, the

---

[24] *Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).

17

pubic hair, blood on the bathroom faucet, Donahew's fingernail clippings, male DNA discovered on the bra and shirt Donahew wore on the day of her death, and the knife. We therefore sustain Appellant's issue as to all those remaining items.

**Conclusion**

We sustain Appellant's sole issue in part and reverse in part the trial court's order denying his second motion for DNA testing. Specifically, we affirm the order as to the blood found on the Bic pen and in the closet, but we reverse the order as to the hairs in Donahew's hands, the pubic hair, blood on the bathroom faucet, Donahew's fingernail clippings, male DNA discovered on the bra and shirt Donahew wore on the day of her death, and the knife. We remand this case to the trial court for further proceedings in accordance with this opinion.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

LIVINGSTON, C.J., dissents without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 4, 2014

18