

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP–76,970

**CHARLES D. RABY, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPEAL IN CAUSE NO. 9407130
### FROM THE 248TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY

MEYERS, J., delivered the opinion for a unanimous Court. RICHARDSON, J., filed a concurring opinion in which KEASLER, HERVEY, and YEARY, JJ., joined.

## O P I N I O N

Appellant was convicted of capital murder and sentenced to death. The conviction was affirmed in *Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998). Appellant filed a motion for post-conviction DNA testing pursuant to Code of Criminal Procedure Chapter 64, which the trial court denied. We overruled the trial court's denial of Appellant's Chapter 64 motion. *Raby v. State*, No. AP-74,930, 2005 Tex. Crim. App. LEXIS 2194

(Tex. Crim. App. June 29, 2005) (not designated for publication). After the victim's underwear and fingernail clippings were tested, the trial court heard testimony from experts regarding the DNA test results. The trial court concluded that the results of the post-conviction DNA testing were not favorable to Appellant. *See* TEX. CODE CRIM. PROC. art 64.04. Appellant now appeals the district court's ruling, raising the following three points of error:

> 1. The district court erred in applying a proof of innocence standard to its determination under Article 64.04, instead of determining whether, more likely than not, at least one juror would find that reasonable doubt exists in this case, if the new DNA evidence were available.
> 2. The district court erred in holding that no juror would harbor a reasonable doubt in this or any case involving a claimed confession and an unkept home, where testing shows that one or more people–not Mr. Raby–left blood and DNA under the decedent's long, blood-caked fingernails.
> 3. The district court erred in excluding important forensic and other evidence not relating directly to DNA testing bearing on the strength of the new evidence.

Because Appellant was sentenced to death, direct appeal is to this Court. *See* TEX. CODE CRIM. PROC. art. 64.05.[1] We will affirm the findings of the trial court.

## FACTS

We granted Appellant's motion for post-conviction testing on the victim's underwear, nightshirt, and fingernail clippings. The nightshirt was not tested because it was never found in the Houston Police Department property room and testing on the

---

[1]Unless otherwise specified, all subsequent references to Articles are to the Texas Code of Criminal Procedure.

underwear indicated that the blood was from the victim. The Article 64.04 hearings focused on the fingernail clippings, which were determined to contain a weak and incomplete DNA profile from an unknown male.

At the close of the hearings, which spanned a three-year timeframe, the trial court completed Findings of Fact and Conclusions of Law. The trial court stated,

> Having heard arguments, read the parties' briefing, affidavit evidence, and other exhibits, reviewed the trial transcript, and considered the testimony of experts, including forensic DNA experts interpreting the DNA test results that have been obtained, this Court has concluded that the results are not favorable to Petitioner, and that had the DNA test results obtained under Chapter 64 been available in 1994, it is reasonably probable that Raby would have been prosecuted or convicted.

The trial court's findings of fact and conclusions of law also included the following: The trial court found that two of the fingernail clippings from the victim's left hand contained indications of low-level Y-chromosome DNA; that the DNA from the fingernails is a mixture of at least two individuals and is weak and incomplete; that Appellant is not a contributor to the DNA profile found on the fingernail clippings; and that the victim's grandsons were also excluded as contributors to the DNA profile from the fingernail clippings.

The serology reports discussed at the hearings indicated that the victim had type B blood and Appellant has type O blood. The trial court noted that the original report said that blood having an inconclusive typing result was found on the victim's fingernails and that at trial, the HPD crime lab employee said that he was unable to do a comparison

between the evidence and Appellant's blood, so the results were inconclusive. The trial court found Appellant's expert to be credible and persuasive when she testified at the hearing on post-conviction testing that the reporting of the results as "inconclusive" was contrary to and not supported by the record. Appellant's serology expert also testified that the A antigen activity detected on the victim's right fingernail could not have come from Appellant or the victim, and the source of the A antigen activity remained unknown. Appellant, however, cannot be excluded as a contributor to the blood detected on the victim's fingernails. The serologist opined that the police offense report should have stated that the A and B activity detected on the fingernail samples could not have come from the defendant and that blood was not detected on the defendant's jacket or t-shirt.

The trial court found that the victim was undernourished, weak, frail, and ill; she had trouble walking and spent most of her time in bed. Appellant was friends with the victim's grandsons and had been in her home on many occasions, often entering through two different bedroom windows. The trial court found that a week prior to the offense, the victim told Appellant to leave her house because she did not like him, which caused Appellant to get angry and throw a beer bottle. The court found that the victim's house was messy and in disarray at the time of the offense and that her grandson admitted that he was a poor housekeeper. The victim's grandsons often had friends visit the house and the house was being painted by a male painter at the time of the offense. The trial court found that the victim's daughter spoke to her at 6:45pm on the evening of the offense.

The victim's grandson returned home at 10:00pm and found the victim's body in the living room. The cause of death was multiple stab wounds, which could have been inflicted by a pocketknife with a blade as small as two inches.

The trial court found that Appellant confessed, "stating that he was carrying a pocketknife that he used to clean his fingernails on the day of the complainant's murder. In his confession, the defendant recounted, inter alia, how he had been drinking beer, whiskey, and Mad Dog 20/20 and stated the following:"

> I drank the bottle of wine and then I walked over to Lee's house on Westford Street. Lee lives there with his grandmother, Edna and his cousin Eric. There is an old Volkswagon in the drive way at their house. I walked up to the front door. The front door has a screen type door in front of a wooden door. I knocked on the door. I did not hear anyone answer. I just went inside. I sat down for a little bit on the couch. I called out when I got inside but I did not hear anyone say anything. I heard Edna in the kitchen. I walked into the kitchen and grabbed Edna. Edna's back was to me and I just grabbed her. I remember struggling with her and I was on top of her. I know I had my knife but I do not remember taking it out. We were in the living room when we went to the floor. I saw Edna covered in blood and underneath her. I went to the back of the house and went out the back door that leads into the back yard.

> Shortly after I had left Lee's house on Westford I was approached by a man and this man told me something like "I had better not catch you in my yard," "jumping his fences." Or something like that. I woke up later on the ground near the Hardy Toll Road and Crosstimbers. I walked home, on Cedar Hill from there. I remember feeling sticky and I had blood on my hands. I washed my hands off in a water puddle that is near the pipe line by the Hardy Toll Road. I do not remember what I did with my knife.

> The next day I knew I had killed Edna. I remembered being at her house and struggling with her and Edna was covered with blood when I left. I think I was wearing a black concert shirt, the blue jeans Im [sic] wearing and my Puma tennis shoes. I also had on a black jacket.

The trial court also found that the defense did not urge an exculpatory account of the offense at trial; the defense conceded that Appellant admitted to killing the victim but argued that it did not rise to the level of a capital murder because the State failed to prove that the offense was committed in the course of robbery, aggravated sexual assault, or burglary. The defense asked the jury to return a verdict of the lesser-included offense of murder and stated that the defendant killed the victim and nothing more.

The court found unpersuasive and not dispositive to the findings the information in Appellant's proffered affidavits from individuals who were not involved in the post-conviction DNA testing process. The trial court concluded that Appellant's DNA expert's testimony that the presence of weak and incomplete male DNA on the victim's fingernails was "potentially probative evidence" in identifying the killer does not warrant a favorability finding under Article 64.04. The trial court found that the results of post-conviction DNA testing are not favorable to the defendant based on the following evidence: the absence of Appellant's DNA on evidence subjected to DNA testing did not warrant the conclusion that Appellant did not commit the offense; there was no indication of when or how the low levels of DNA were deposited on victim's fingernails; the expert could not say that the DNA originated from the assailant; there were sources for the male DNA other than the assailant; it is possible for foreign DNA to be under the fingernails from daily contact; the weak and incomplete male DNA on the victim's fingernails could have been deposited by contact with various surfaces, such as the floor where her body

was discovered or from other male individuals who entered her home. The trial court also considered the expert's statement that Appellant could not be excluded as a contributor of the blood detected on the victim's fingernails.

The trial court found that the totality of the evidence, including the confession and circumstantial evidence, present a strong case that Appellant committed the offense. The trial court considered circumstantial evidence such as Appellant's prior confrontation with the victim, trial witnesses who saw Appellant in the victim's neighborhood at the time of the murder, Appellant's statement to one neighbor that he was going to the victim's house to look for his friends, and Appellant's flight from his girlfriend's house when the police arrived to question him. Trial witnesses also corroborated details of Appellant's confession, including the clothes he was wearing, that he was drinking and carrying a pocket knife just prior to the offense, that he exited out the back door of the victim's house, and that he was confronted by one of the neighbors for jumping the fence after the offense. The trial court stated:

> I make my findings based on seeing juries' strong reliance on confessions, especially when confessions are supported with witnesses who know the Applicant is heading to the decedent's home and witnesses who see the Applicant flee from the back of the home, in addition to photos of a home where it would not be unlikely for any dweller to pick up DNA from a source other than Applicant. Accordingly, this Court finds that the jury would have made the same determination even with the new DNA and Serology evidence.

## APPELLANT'S ARGUMENTS

Appellant argues that the district court applied an actual-innocence standard in

evaluating the DNA evidence when proof of innocence is not required under Chapter 64. Rather, the question the court must answer is whether there is a 51% chance that the defendant would not have been convicted had the DNA results been available at trial. New DNA evidence need only be sufficient to have established doubt about guilt in the mind of at least one juror so as to preclude a unanimous verdict. Appellant contends that given the State's theory of a single assailant, reasonable doubt is established by the finding that the victim's fingernails contained male DNA that did not come from Appellant. Had the district court applied the correct reasonable-doubt standard, Appellant says that the results of the DNA testing would have been considered favorable to him and a fair-minded juror would find reasonable doubt about his guilt.

Appellant argues that the district court basically held that juries will not consider forensic evidence when a defendant has confessed to the crime. The court focused on his custodial statement and the disarray at the scene of the murder, even though the experts agree that the blood and DNA found on the victim's fingernails did not come from Appellant. By granting DNA testing, this Court found that the corroborated evidence that he was near the victim's home at the time of the murder would not preclude a finding that the DNA evidence was favorable, so the trial court should not have determined that the existence of the confession removes the possibility of the DNA results being exculpatory. And, because some of Appellant's custodial statement was inconsistent with evidence in the case, the statement does not prevent the DNA results from creating reasonable doubt.

Appellant argues that the trial court erred in concluding that the victim's messy house provided an innocent explanation for why DNA not belonging to him was found at the scene. Appellant presented studies showing that DNA found under a victim's fingernails after a violent crime was not commonly transferred by casual contact and that foreign DNA is rarely found under an individual's fingernails under normal circumstances. Thus, the disarray of the house does not overcome the reasonable doubt raised by the existence of DNA not belonging to Appellant that was found under the victim's fingernails. Appellant contends that the DNA found under the victim's fingernails is probative to the assailant's identity because the victim normally had very little physical contact with others but would have had considerable contact with her attacker, as indicated by her defensive wounds and crime-scene evidence of a struggle. Appellant's DNA expert opined that the DNA test results were highly probative when considered with the other evidence and would provide reasonable doubt for a jury.

Appellant argues that although Article 64.04 includes only DNA evidence, he should have been able to call witnesses other than a DNA expert to testify in light of the new DNA results and should have been able to question witnesses on other forensic issues that would have made the DNA evidence more probative. Had the DNA results been available at the time of the trial, Appellant says that his trial strategy would have been different, and he should be able to address these issues by calling witnesses to testify at the hearing. Appellant concludes that there are no limits on the evidence that may be

introduced in Chapter 64 proceedings and the trial court erred in excluding evidence that provided context for evaluating the DNA evidence, which would have been introduced at trial if the DNA results had been available.

Appellant asks us to reverse the findings of the trial court and rule that it is reasonably probable that he would not have been convicted had the results of the DNA testing been presented at his trial.

### STATE'S ARGUMENTS

The State says that the trial court applied the correct standard in assessing the favorability of the DNA test results. The court stated that it did not apply an innocence standard and that Appellant was not required to prove his innocence. The State argues that DNA results establishing that Appellant's DNA was not on the victim's fingernail scrapings do not warrant a favorability finding because there is no evidence that the victim was able to hit or scratch her assailant as she was attacked. Due to the victim's weakness and frailty and the injuries that she sustained in the attack, it is reasonable to conclude that she was taken by surprise, overpowered, and unable to fight back. Appellant stated in his confession that he grabbed the victim from behind while holding a knife and much of Appellant's confession is corroborated by witness testimony and by other evidence. The State concludes that the absence of a defendant's DNA from a victim's fingernails has minimal exculpatory value and the trial court properly found that the results of the post-conviction DNA testing were not favorable to Appellant.

Citing *Rivera v. State*, 89 S.W.3d 55 (Tex. Crim. App. 2002), the State argues that even if DNA results provide a weak exculpatory inference, the inference does not outweigh a defendant's confession. By granting the motion for DNA testing, this Court said that the confession did not prevent Appellant from establishing the issue of identity, but we did not reject the consideration of the confession in determining favorability of the DNA test results. The trial court did not focus on just Appellant's confession and the disarray of the murder scene, it also considered the facts raised at trial and the expert testimony presented at the hearing. The State points out that even Appellant's DNA expert testified that there was no indication of when or how the DNA got on the victim's fingernails and that there were possible sources for the DNA other than the assailant.

The State argues that the evidence that Appellant complains was improperly excluded was outside the scope of Chapter 64. An Article 64.04 hearing is limited to a determination of the favorability of post-conviction DNA testing results; it is not the place to present evidence that is more properly considered in a habeas proceeding. The State notes that although Appellant's proposed testimony was properly excluded because it was not relevant to the trial court's consideration of the DNA results, Appellant was permitted to offer affidavits from witnesses who did not testify at the hearing and the trial court considered the affidavits in making its favorability determination.

## DISCUSSION

*Standard*

Although Article 64.04 has since been amended, at the time Appellant filed his motion for DNA testing, Article 64.04 stated:

> After examining the results of testing under Article 64.03, the convicting court shall hold a hearing and make a finding as to whether the results are favorable to the convicted person. For the purposes of this article, results are favorable if, had the results been available before or during the trial of the offense, it is reasonably probable that the person would not have been prosecuted or convicted.

At the hearing, Appellant discussed the standard for reviewing a Chapter 64 motion and the differences between that standard and the actual innocence standard. The judge agreed that proof of innocence was not required. Appellant says that the court used an innocence standard in finding "that the absence of the defendant's DNA on evidence subjected to post-conviction DNA testing did not warrant the conclusion that the defendant did not commit the instant offense." The court also concluded that "the defendant cannot be excluded as a contributor to the blood detected on the complainant's fingernails. Accordingly, such evidence does not warrant a finding of favorability pursuant to Article 64.04. Moreover, such evidence, in addition to the inculpatory evidence elicited at trial, does not unquestionably establish the defendant's innocence." While it is true that the trial court did cite some actual-innocence cases, it was only after the court had already concluded that the evidence did not warrant a favorability finding under Article 64.04, and nothing in the record indicates that the court improperly used an actual-innocence standard in making its determination on the favorability of the DNA results. Some of the serologist's testimony may have been considered "newly discovered

evidence" and discussed in terms of the *Elizondo* actual-innocence standard rather than the reasonable-probability standard for Chapter 64 DNA evidence. *See Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996). However, most of the discussion at the close of the Chapter 64 hearing focused on the proper application of the Article 64.04 standard. At the hearing, the court addressed Appellant's burden in terms of finding him "not guilty" and discussed whether the unknown DNA on the victim's nails establishes "reasonable doubt" that he committed the crime to which he confessed. The trial court's findings of fact and conclusions of law are supported by the record, and the discourse at the hearing indicated that the trial judge understood the proper standard and considered whether it was reasonably probable that Appellant would not have been prosecuted or convicted had this evidence been presented to the jury at his trial.

### The Confession and State of the Crime Scene

Exculpatory DNA test results are results that would exclude the appellant as the donor of the biological material tested. As we stated in *Ex parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011), "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction." When post-conviction testing leaves the court with a question, the court looks to the evidence raised at trial to determine if the jury would still have convicted the appellant had this evidence been presented to them.

Here, the results of the post-conviction testing indicated that the blood sample

from the victim's fingernails contained A-antigen activity that could not have come from either Appellant or the victim, but that Appellant cannot be excluded as a contributor. The expert testified that this is due to the fact that A, B, and H antigens were all present on the victim's fingernail sample and that the source of such antigen activity is most likely an individual with AB blood type. However, the source could be a mixture of three individuals with A, B, and O blood types, or a mixture of two individuals–one with blood type AB and the other with type O, or one with blood type A and the other with type B. Because the victim had blood type B and Appellant had type O, this leaves the possibility that Appellant was the contributor of the H antigens, the victim was the contributor of the B antigens, and the A antigens came from some other source. It is known that the A antigen in the sample did not come from Appellant, and the fact that H antigens were detected in the sample does not necessarily mean that type O blood (such as Appellant's) was present.

Appellant's expert testified that the results were potentially probative, but that the DNA could have been deposited in many ways. When the evidence was collected in 1992, the collection methods were not by the same standards as are now used. The fingernails were stored in two plastic containers, one container for the fingernails of each hand, and the DNA could have come from the top of or underneath the fingernails. Appellant's expert said they found low-level male DNA on two of the nails and they combined those two samples and got a low-level partial profile. The sample was a

mixture of at least two males, neither of which were Appellant or the victim's grandsons. Appellant's expert says this is probative because, if the DNA did not come from innocent contact with somebody the victim had close daily contact with, it "may have originated from the perpetrator who murdered Ms. Franklin."

Appellant argues that the results should be determined to be favorable to him because there was blood at the scene of the crime that was not from him. He also disagrees with the court's finding that his expert could not definitively state that the male DNA originated from the assailant and says that his expert testified that the evidence does indicate reasonable doubt. Appellant notes that, because the DNA came from blood, the court's findings that there was no indication of when or how the DNA was deposited, that there were possible sources of the DNA other than the assailant, and that the DNA could have come from normal contact, are incorrect. However, Appellant's expert did testify that there was no way of knowing when or how the DNA was deposited. Appellant argues that there was no evidence of any sources of blood other than the assailant and there was proof of a struggle between the victim and the assailant because the victim had bruises on both of her arms that could have been defensive wounds. The State responds that, while the victim had some defensive wounds and bruises, there was no evidence that she scratched the assailant and would therefore have had his blood under her fingernails. The State also asserts that the evidence that the victim was elderly, weak, and frail, and Appellant's confession, which stated that he came at her from behind refutes evidence of

a struggle.

The State's expert testified that the absence of DNA does not mean the absence of contact. For example, the victim's grandsons had regular contact with her, but their DNA was not found on her fingernails. The expert also said that the victim could have picked up male DNA from laying on the floor after her attack and that contamination cannot be ruled out because the sample was small and weak. Appellant's expert agreed that contamination could not be ruled out and that there was no way of knowing when the DNA got on the victim's fingernails.

In *State v. Swearingen*, 424 S.W.3d 32, 38-39 (Tex. Crim. App. 2014), we reversed a trial court's order for DNA testing of scrapings from the victim's fingernails. In that case, as here, the evidence against Swearingen was primarily circumstantial. There was evidence that Swearingen told acquaintances that he was going to meet the victim and evidence that, on the day of the crime, Swearingen was seen in the area where the victim's body was later found. Swearingen fled from police and, while in jail, confessed to the murder and wrote a letter detailing specifics of the offense that were corroborated by physical and medical evidence. Unlike here, however, there was evidence that the victim may have scratched Swearingen, as he had red marks on his neck, cheek, and back at the time of his arrest. Despite this evidence and the fact that preliminary testing excluded both the victim and Swearingen as contributors of the blood under the victim's fingernails, we failed to see how the presence of unidentified male

DNA under the victim's fingernails would change the jury's verdict of guilt. We stated:

> We are not persuaded that results showing the presence of another DNA donor in the fingernail scrapings would overcome the "mountain of evidence" of the appellee's guilt. Primarily, this is because the victim's having encountered another person would not factually exclude the appellee from having killed her. There are many ways someone else's DNA could have ended up in the victim's fingernails. Such results would not require an inference that the appellee would [have] been acquitted.

*Id*. at 38-39.[2] We agree with *Swearingen* that the fact that DNA from an unknown source was present on the victim's fingernails shows only that some other person had some contact with the victim at some unknown point in time, and there is nothing to show that the DNA was left by the assailant.

The court did not err in considering the crime-scene photos that showed that the victim's home was messy and in disarray. Such evidence was relevant to the explanation and interpretation of the DNA test results. Appellant's argument that blood on the victim's fingernails could have come only from the victim, her two grandsons who lived with her, or her killer may have been more persuasive if the house appeared spotless and recently thoroughly cleaned. Appellant emphasized that the victim's grandsons were her only contacts, but other evidence indicated that, although the victim was ill and rarely left her home, she had a lot of contact with people. Her grandsons had many friends who often visited the home, which could explain why she had male DNA not belonging to Appellant on her fingernails. And, because the house was messy and not regularly

---

[2]One distinguishing factor between *Swearingen* and the case before us is that, in *Swearingen*, the preliminary test results showing that the blood under the victim's fingernails did not come from the victim or Swearingen had been presented to, and disregarded by, the jury.

cleaned, the DNA could have been left by one of the many past visitors and could have been there for a long period of time. Appellant contends that the studies show that most foreign DNA under fingernails comes from intimate contact or from someone the victim has struggled with during an attack and the fact that the DNA is from blood makes it less likely that she got it by casual contact. Appellant also points out that, if the DNA on the victim's fingernails was casually picked up from the messy home, then you would expect some of the DNA to be from her grandsons, who lived in the home with her. The State responds that the studies cited by Appellant show how often someone's DNA does not appear, so it is not surprising that Appellant's DNA would not be found even if he committed the crime.

According to Appellant, we should consider the presence on the victim of DNA that did not come from him to be exculpatory rather than looking for hypotheticals to explain how he might still be guilty even with these DNA results. However, we disagree that the court used the state of the crime scene to come up with hypothetical scenarios to show Appellant's guilt. Appellant signed a confession and admitted in court that he was guilty of the crime. Independent testimony by witnesses who saw Appellant immediately before and after the crime was committed corroborated parts of the confession.

The record supports the trial court's findings that there is not a reasonable probability that had these DNA results been available before or during his trial, Appellant would not have been prosecuted or convicted. The trial court did not err in considering

Appellant's confession and the state of the crime scene in making this determination.

***Excluded Testimony***

Appellant wanted to present testimony at the Chapter 64 hearing that was not directly related to the results of the DNA testing. He says that, if blood DNA evidence had been available at the time of trial, then the whole case would have been different; it would have been investigated differently by the Houston Police Department, handled differently by prosecutors, and defended differently by his counsel. He wished to call witnesses at the Chapter 64 hearing, including his trial counsel, the victim's grandson, the HPD crime lab technician who testified at the trial, and a pathologist to provide context for the evaluation of the DNA results and to present evidence that likely would have been introduced at trial if the DNA evidence had been available.[3] However, such testimony is outside the scope of a Chapter 64 hearing. As we stated in *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002), under Article 64.04, "the Legislature provided for a hearing, to give the parties a forum to submit evidentiary matters relating to the test results." A hearing under Article 64.04 is solely for the purpose of examining the results of DNA testing to determine whether the results are favorable to the appellant and show that it is reasonably probable that he would not have been prosecuted or convicted had the results been available before or during the trial. While the court may consider all of the evidence from the trial in light of the new DNA test results in making a favorability determination,

---

[3]The trial court excluded these witnesses but allowed them to submit affidavits, which the court found unpersuasive and not dispositive to the findings under Article 64.04.

a Chapter 64 hearing is not a retrial of the case. In *Ex Parte Gutierrez*, 337 S.W.3d 883 (Tex. Crim. App. 2011), we explained that "Chapter 64 is simply a procedural vehicle for obtaining certain evidence 'which might then be used in a state or federal habeas proceeding.'" *Id*. at 890 (*citing Thacker v. State*, 177 S.W.3d 926 (Tex. Crim. App. 2005)). Exculpatory DNA results are the "certain evidence" to which we were referring. The evidence presented at a Chapter 64 hearing should be limited to the explanation of the results of the new DNA testing.

We agree with the State that testimony that was not directly related to the results of DNA testing was outside the scope of the Chapter 64 hearing and would be more properly raised in Article 11.071 habeas proceedings. The trial court did not err in excluding such evidence.

## CONCLUSION

The trial court applied the proper standard and concluded that the results of the DNA testing were not favorable to Appellant. It was not error for the trial court to consider the DNA results in light of other evidence raised at trial, including Appellant's confession and the state of the crime scene. It was also proper for the trial court to limit the scope of the Chapter 64 hearing to expert testimony related to the examination of the DNA test results.

The findings of the trial court are affirmed.

Delivered: April 22, 2015
Do Not Publish