

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00238-CR

Kimberly Clark **SAENZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 217th Judicial District Court, Angelina County, Texas
Trial Court No. CR28665
Honorable Barry R. Bryan, Judge Presiding

Opinion by:   Patricia O. Alvarez, Justice

Sitting:    Catherine M. Stone, Chief Justice, retired (not participating)
        Marialyn Barnard, Justice
        Patricia O. Alvarez, Justice

Delivered and Filed:  August 26, 2015

AFFIRMED

During April 2008, five patients died and at least five patients suffered episodes of unexplained illnesses and cardiac arrest while undergoing dialysis treatment at the DaVita Healthcare Dialysis Clinic.  Appellant Kimberly Saenz, a licensed vocational nurse employed at the dialysis clinic, was charged by indictment with five counts of aggravated assault involving five separate individuals and one count of capital murder also involving five different individuals.  A jury found Saenz guilty of capital murder and three counts of aggravated assault and acquitted Saenz on two counts of aggravated assault.  The jury sentenced Saenz to twenty-years'

imprisonment in the Institutional Division of the Texas Department of Criminal Justice for each count of aggravated assault and to life in prison without parole for capital murder.

On January 22, 2014, this court overruled each of Saenz's twenty-one issues on appeal and affirmed the trial court's judgment. On December 10, 2014, the Texas Court of Criminal Appeals reversed this court's holding regarding the jury charge and remanded this matter for an egregious harm analysis under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *Saenz v. State*, 451 S.W.3d 388, 392 (Tex. Crim. App. 2014). Although both the jury charge and argument of counsel weigh in favor of egregious harm, we conclude the state of the evidence and the record as a whole substantially support a finding of guilt with regard to each of the five capital murder victims. Accordingly, we hold the record does not establish egregious harm, and we affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

**A.      DaVita Healthcare Dialysis Clinic**

*1.      Unusual Events in April of 2008*

Between April 1, 2008 and April 28, 2008, the DaVita HealthCare Partners, Inc. dialysis facility in Lufkin, Texas experienced an unusual number of patients suffering episodes of illness and cardiac arrest while undergoing dialysis treatment. Patients were becoming sick and dying in an unexplained manner. Dialysis patients undergo a life sustaining process that acts as a substitute for their failed kidneys. Although dialysis patients generally suffer from health problems, the number of deaths the clinic was experiencing was alarming and unexplainable. As a result, DaVita continued to increase supervision and examinations of medication and treatment practices, but patients continued to experience unusual symptoms, and patients continued to die.

During the month of April 2008, the following patients suffered injuries during their treatment at the DaVita dialysis clinic:

| | |
|---|---|
| April 1, 2008 | Clara Strange and Thelma Metcalf died after suffering cardiac arrest |
| April 16, 2008 | Garlin Kelley suffered cardiac arrest and died two days later at the hospital; Graciela Castañeda lost consciousness during treatment |
| April 22, 2008 | Cora Bryant suffered cardiac arrest and died three months later at the hospital |
| April 23, 2008 | Marie Bradley suffered a severe drop in blood pressure |
| April 26, 2008 | Opal Few died after suffering cardiac arrest; Debra Oates experienced multiple symptoms and a severe drop in blood pressure |
| April 28, 2008 | Marva Rhone and Carolyn Risinger both suffered severe drops in blood pressure |

2. *Kimberly Saenz*

At the time of the alleged incidents, Saenz was a licensed vocational nurse and had been employed at the dialysis clinic for approximately nine months. Although Saenz was licensed to administer medication, DaVita often required Saenz to serve as a patient care technician, the employee who connected the patient to the dialysis machine and attended to their needs during the dialysis.

Clinic employees reported Saenz was not happy with her employment at DaVita. Several people reported Saenz was frustrated when DaVita would reassign her to the lesser position of patient care technician. Saenz herself considered administration of medications much less stressful and felt she was being treated unfairly by DaVita. During her April 28th shift, Saenz was described as "teary-eyed" in reaction to her patient care technician assignment.

In addition to Saenz's displeasure with DaVita's daily assignments, Saenz verbally expressed her aversion to some of the DaVita patients. One employee testified Saenz specifically voiced her dislike of Strange, Metcalf, Kelley, Few, Oates, Rhone, and Risinger, all of whom either died or were injured during treatment in April of 2008.

Records substantiate that during each of the alleged incidents, Saenz was at the DaVita facility functioning either as a patient care technician or as a nurse responsible for preparing medications for each patient.

### 3. *Testimony Regarding Bleach*

Bleach is a disinfectant used on a daily basis by the DaVita employees, and employees at other dialysis clinics, to clean the chairs and equipment between uses. The patient care technicians mix a diluted solution of bleach and water on rags to wipe down the chairs, machines, and other surfaces between patients. Additionally, once a week, the machines are cleaned internally with a bleach solution. The jury heard extensive testimony regarding the proper procedure used to mix the bleach solution and, specifically, how Saenz mixed the bleach solution. Saenz testified the agency brought in monitors, individuals to ensure compliance with protocols, in an attempt to determine a cause for the unexplained patient complications. She further explained the monitors' presence made her nervous and, as a result, she took extra precautions.

On April 28, 2008, witnesses reported seeing Saenz prepare a bleach solution by pouring bleach into a container and then injecting a bleach-filled syringe into two patients' intravenous (IV) dialysis line. Lurlene Hamilton, a dialysis patient, witnessed Saenz inject Rhone's and Risinger's IV lines. Hamilton told the clinic supervisor, Amy Clinton, that Saenz placed the bleach solution container on the floor. Saenz then took out a bottle of bleach and poured the bleach into that container. Hamilton further relayed seeing Saenz draw up syringes of bleach from the container on the floor and inject bleach into Rhone's dialysis line. Hamilton then saw Saenz repeat the process and inject bleach into the dialysis line of Risinger. Hamilton explained to Clinton that "I'm a little nervous right now, and I'm worried because she's assigned to me." Another patient, Linda Hall, witnessed Saenz fill a syringe and inject Rhone's "saline" line. Both witnesses saw

Saenz dispose of the syringes in the DaVita sharps containers. Additionally, both witnesses reported Saenz's action to supervisors shortly after Rhone and Risinger experienced symptoms.

Saenz acknowledged using a syringe to extract the bleach from its container because she was concerned about being precise and following procedures. She adamantly denied ever injecting bleach into a patient.

*4. Incriminating Statements Made by Saenz*

Beginning immediately after the reports made by Hamilton and Hall, Saenz made several incriminating statements and engaged in several questionable actions.

a. <u>Statement to Amy Clinton</u>

After speaking to Hall and Hamilton, Clinton asked Saenz whether she had administered any medication that day. Saenz denied administering medication. Yet, when asked about the bleach, Saenz explained that she "was drawing up bleach to mix for her containers" that she had on the floor. Three syringes collected from the sharps' container tested positive for bleach.

b. <u>Statement to Werlan Guillory</u>

The following day, April 29, 2008, DaVita called a mandatory meeting. The facility was closed during the investigation and the employees were notified. All of the employees, with the exception of Saenz, attended the meeting. When she did not appear for the meeting, one of Saenz's co-worker's, Werlan Guillory, called and inquired, "Where are you? Are you coming to the meeting?" Saenz replied in the negative, explaining "I'm a chaperone at my daughter's field day." Guillory expressed concern that Saenz could lose her job, but Saenz simply responded, "Okay."

After the meeting, Guillory went to find Saenz. An uncharacteristically unkempt Saenz acted like she did not recognize him. When he approached her, she was crying and told him that "she didn't kill those people." Guillory described Saenz as "seem[ing] like she had lost all the

hope in the world." The comment was unexpected because, at that point, no one had made any allegations accusing anyone of killing patients.

### c. Interview with Lufkin Police Department

During Saenz's interview with Corporal Mike Shurley and Sergeant Stephen Abbott of the Lufkin Police Department, Saenz's statements were often disjointed, and she had difficulty staying focused on the questions asked by the officers. Saenz was noticeably upset that "two patients [accused] her of giving another patient's medication that was not ordered."

She expressed concern that she was "scared to go to work . . . cause [DaVita] can't tell us what's going on, and I'm doing everything by the book, and I'm scared because I have a license." Saenz further explained, "if I'm doing something wrong, I want to know that I'm doing something wrong 'cause I don't want to kill somebody." When asked about whether she administered any medications during her shift on April 28, 2008, Saenz explained,

> I did give [Rhone] some saline, only because she said she was cramping. Opened her saline line, [her nurse] wasn't there, so I charted that I gave her some saline line. She—her pressure didn't really go down that much, and then she just said she felt kind of nauseated.

When the officers asked Saenz if she had any theories about the underlying cause of the injuries, Saenz questioned the "bleach loop" and expressed curiosity whether "our machines are hooked up and they have some bleach in 'em." When asked to explain the clinic's "bleaching procedures," Saenz described a bleach area at the back of the facility where a medicine cup is used to pour bleach into a container with water. Sponges are then soaked in the liquid to wipe the chairs. Although Saenz understood the policy was to use a medicine cup to measure the bleach, when pushed by the officer on whether she had ever used a syringe to measure the bleach, Saenz acknowledged doing so.

> Sometimes I do when I can't find a—the little medicine cups.

> . . . .
>
> There wasn't any cups up there that day. But if you use a syringe, 10 cc, then you're going to have to, you know, put it in the receptacle.
>
> . . . .
>
> so I took my bleach and I just poured it [into one of the receptacles], and then I pulled [the bleach] up to 10 [cc], 'cause I knew that would be like 10 ml.

Saenz further explained the monitors at the facility made her nervous, and she wanted to ensure that she was precisely following procedures. Other than Saenz's own statement, there was no evidence that the supply of measuring cups was depleted.

### d. Internet Searches

The State's computer forensic analyst, Mario Marez, testified that Sergeant Abbott provided him with two laptop and two desktop computers which were seized from Saenz's and her parents' homes. His examination of the computers revealed Saenz ran two different searches:

(1) On April 2, 2008, at approximately 4:15 a.m., a Yahoo search for "bleach poisoning"; and

(2) On May 3, 2008, at approximately 7:00 p.m., Yahoo searches for "bleach given during dialysis," "can bleach be detected in dialysis lines," and "dialysis patients symptoms of bleach infusion."

Saenz's first search was conducted, shortly after four in the morning, the day after the first victims, Strange and Metcalf, died and *before* anyone had raised any suspicions as to foul play. During her interview with the officers and again during her grand jury testimony, Saenz acknowledged running the searches explaining that she was nervous and wanted to understand why her patients were dying.

### e. Grand Jury Testimony

Saenz also testified before the grand jury claiming she felt like she had "been a scapegoat for something that [DaVita] could have kept from happening." Saenz explained that on April 28, 2008, all of the employees were on edge, "we were all scared 'cause we didn't know what it was."

She stated the employees met on several occasions to discuss the situation and further relayed that DaVita "brought in this mock state team, and they were there that day. And I had a lady that was shadowing over me."

With regard to her patient contact on April 28th, Saenz explained that when another employee went for a break, "one of her patient's machine alarms kept going off." Saenz explained that [Rhone's] machine was "clotting off," which required the tech to "flush [the lines] with saline." She also acknowledged knowing that Hamilton and Hall reported seeing her inject bleach into a patient's line. Yet, Saenz was adamant, "I flushed [Rhone's] machine with saline and I told [Clinton] and she was like, don't worry about it, you know, just go on to lunch and we will calm them down." When Clinton asked her if she injected any medications, Saenz told her that she injected the saline.

The grand jurors questioned Saenz about the procedure for mixing the bleach. Saenz explained that before the monitors arrived, "we'd just kind of pour a little bit [of bleach] into the bucket and then fill it with water to clean the machines." But with the monitors present, "they were having us do everything by the book. So I did. I had drawn up a syringe in a bleach—bleach in a syringe earlier to mix my bleach solution." When asked how the needle would reach the bleach, Saenz explained, "we would pour it in the cap and draw it with the syringe." She claimed it was proper procedure if a medicine cup was unavailable.

Throughout the grand jury questioning, Saenz continued speaking without interruption for extended periods of time. On several occasions, she professed her innocence.

> I've been trying to rack my brain 'cause I know I did not do what they are accusing me of doing. I know I did not do that. I would never inject bleach into a patient.
>
> . . . .
>
> I feel so railroaded. I feel like there is this big company and they need a way to get out of it, and I am the scapegoat, and that is how I feel.

**B.      Procedural Background**

Saenz was charged by indictment with five counts of aggravated assault for five separate individuals—Marva Rhone, Carolyn Risinger, Debra Oates, Graciela Castañeda, and Marie Bradley.  In each of the allegations, Saenz was charged with introducing sodium hypochlorite, commonly known as bleach, or other chlorinating agent into each victim's bloodstream.

In the sixth count, Saenz was charged with capital murder, specifically by

caus[ing] the death of more than one of the following persons:  Clara Strange, Thelma Metcalf, Garlin Kelley, Cora Bryant, or Opal Few during the same criminal transaction or during different criminal transactions but pursuant to the same scheme or course of conduct, by introducing sodium hypochlorite, commonly known as bleach, or other chlorinating agent into the body's bloodstream.

*1.      Jury Trial*

After seventeen days of testimony from fifty-nine witnesses and the introduction of almost four hundred exhibits, the jury returned the following verdicts:

(1)      Guilty on three counts of aggravated assault - Counts I (Marva Rhone), III (Debra Oates), and V (Marie Bradley);

(2)      Not guilty on two counts of aggravated assault - Counts II (Carolyn Risinger) and IV (Graciela Castañeda); and

(3)      Guilty of capital murder concerning the deaths of Clara Strange, Thelma Metcalf, Garlin Kelley, Cora Bryant, and Opal Few.

The jury assessed punishment at twenty-years' imprisonment for each count of aggravated assault and life in prison without parole for the capital murder charge.

*2.      Fourth Court of Appeals*

In her original appeal to this court, Saenz raised twenty-one points of error.  The claims can be best categorized as follows:

(1) jury charge error—a lack of juror unanimity;
(2) insufficiency of the evidence;
(3) ineffective assistance of counsel;
(4) improper exclusion of evidence; and
(5) improper admission of expert testimony.

On January 22, 2014, this court issued an opinion affirming the trial court's judgment. *Saenz v. State*, 421 S.W.3d 725 (Tex. App.—San Antonio 2014), *vacated* 451 S.W.3d 388 (Tex. Crim. App. 2014).

### 3.      *Texas Court of Criminal Appeals*

Saenz subsequently filed a petition for review with the Texas Court of Criminal Appeals alleging this court erred in its holdings regarding (1) juror unanimity and (2) ineffective assistance of counsel. The court granted the petition for discretionary review "to consider whether a jury charge on capital murder under Penal Code Section 19.03(a)(7) must require the jurors to agree as to the identities and the number of the victims."

On December 10, 2014, the Court of Criminal Appeals reversed this court's January 22, 2014 opinion. The court's opinion relied heavily on the following closing argument made by the State:

> The State has the burden of proof to prove that [Saenz] caused the death of at least two of the five victims. *You don't have to agree as to which two*.

*Saenz*, 451 S.W.3d at 389–90. Although "[t]he unanimity requirement, is not violated by instructing the jury on alternative theories of committing the same offense," *id*. at 390 (quoting *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004)), this is only true "'*so long as the same victim is alleged for the predicate murder,*'" *id*. (quoting *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009)); *accord Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010). The court emphasized that the charge "did not specify the killing of any one victim as the predicate murder, and the jury was not required to specify which two or more of the five alleged victims that they agreed [Saenz] had murdered." *Saenz*, 451 S.W.3d at 391. The court explained as follows:

> Although the charge required the jury to unanimously agree that she killed at least two of the five named victims, there was no requirement that the jurors agree on any one specific murder, which would have served as the predicate murder. Six jurors could have agreed she killed victims A, B, and C, while the other six agreed

> she killed victims D and E. There is no way to know whether the unanimous verdict included agreement regarding the identity of at least one of the victims.

*Id.* at 392. Thus, the court concluded the charge was erroneous. *Id.* Because Saenz did not object to the trial court's jury charge, the Court of Criminal Appeals remanded this cause for an egregious harm analysis under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1995) (op. on reh'g). *Id.*; *see also Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

### HARM ANALYSIS

**A.       Standard of Review under *Almanza v. State***

Saenz's trial counsel did not object to the failure to include the unanimity instruction. When a defendant does not object, a constitutional jury-charge issue is not preserved. *Cosio*, 353 S.W.3d at 776; *Phillips v. State*, 193 S.W.3d 904, 913–14 (Tex. Crim. App. 2006). However, "charge error is never forfeitable by a defendant's failure to object at trial." *Cosio*, 353 S.W.3d at 776; *see also Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d at 171. Instead, a failure to object controls only the type of harm analysis that will be applied. *Cosio*, 353 S.W.3d at 776.

When a defendant does not object to the charge error, his convictions are subject to reversal on appeal only if he has suffered "egregious harm." *Almanza*, 686 S.W.2d at 171. Egregious harm is established if the record shows that the appellant has suffered such harm that the defendant's trial was not fair or impartial. *Id.*; *see Cosio*, 353 S.W.3d at 776–77. Charge error is egregiously harmful when "it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Fulcher v. State*, 274 S.W.3d 713, 716 (Tex. App.—San Antonio 2008, pet. ref'd); *see also Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio*, 353 S.W.3d at 777; *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App.

2015). However, "we do not require direct evidence of harm to establish egregious harm." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). As the court in *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002), opined, it is a "difficult standard."

We consider the following factors in evaluating harm: (1) "the entire jury charge"; (2) "the state of the evidence, including the contested issues and weight of probative evidence"; (3) the parties' arguments at voir dire and at trial; and (4) all other relevant information in the record. *Almanza*, 686 S.W.2d at 171. The *Almanza* analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013).

As the Court of Criminal Appeals concluded, the jury charge did not apprise the jury of the proper unanimity requirement. *See Saenz*, 451 S.W.3d at 392; *see also Arrington*, 451 S.W.3d at 841 (affirming egregious harm when charge instructions "'permitted non-unanimous verdicts based on the evidence presented in the case.'" (citing *Arrington v. State*, 413 S.W.3d at 112)). The jury charge "did not specify the killing of any one victim as the predicate murder and the jury was not required to specify which two or more of the five alleged victims they agreed [Saenz] had murdered." *Saenz*, 451 S.W.3d at 391. We must, therefore, conclude this factor weighs in favor of finding egregious harm. *See Villarreal*, 453 S.W.3d at 433; *Arrington*, 451 S.W.3d at 841.

Similarly, with regard to arguments of counsel, there is little question the prosecutor exacerbated the error by specifically telling the jury it need not agree as to the same two victims. *See Ngo*, 175 S.W.3d at 750. Accordingly, this factor also weighs in favor of an egregious harm finding. *Id*. at 752.

We must, therefore, examine the two remaining factors: (1) "the state of the evidence" and (2) "all other relevant information in the record remaining cognizant this case was highly circumstantial." *Almanza*, 686 S.W.2d at 171. Our inquiry is factual in nature and turns on the unique circumstances of this case. *See Ellison*, 86 S.W.3d at 227. We are called upon to "make

[our] own assessment," based solely on the record before us, to evaluate what effect, if any, the error had on the jury's verdict. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000). Importantly, neither party bears the burden of showing harm, or a lack thereof, under this standard. *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008).

**B.      State of the Evidence and Other Relevant Information**

We begin our harm analysis by reviewing (1) the uncontested factual analysis and legal conclusions set forth in this court's January 22, 2014 opinion and (2) an in-depth examination of the jury's verdict on the aggravated assault charges.

*1.      Uncontested Factual Analysis and Legal Conclusions from Prior Opinion*

When examining the uncontested factual conclusions, we remain mindful that we need not reinvent the wheel. We find the court's rationale in *State v. Swearingen*, 424 S.W.3d 32 (Tex. Crim. App. 2014), instructive. The court reasoned the court of appeals had already determined the trial court record was sufficient to support conviction, thus its analysis did not require another sufficiency review because the previous finding of sufficient evidence governs the appeal. *Id*. at 36–38.

Our situation is analogous. Saenz raised twenty-one issues in her original appeal and we concluded the evidence was legally sufficient to support each of Saenz's convictions. *Saenz*, 421 S.W.3d at 752. Importantly, in her petition for discretionary review, Saenz raised only two issues: juror unanimity and ineffective assistance of counsel. After denying discretionary review on the question of ineffective assistance of counsel, the Court of Criminal Appeals determined the trial court's charge was erroneous on the issue of juror unanimity. Accordingly, the analysis and conclusions by this court on the remaining nineteen issues, including sufficiency of the evidence, addressed in the prior appeal remain uncontested and "govern the appeal." *Id*.

Although our original opinion provided substantial support for each of the scientific conclusions, we need not do so here. For purposes of the harm analysis, we consider the following conclusions, as they are uncontested in Saenz's petition:

- Bleach was injected into the dialysis lines, *Saenz*, 421 S.W.3d at 746;

- Positive blood tests for the 3-chorortysine biomarker and elevated levels of lactate dehydrogenase (LDH) in an individual's blood were evidence of confirmed exposure to bleach in the bloodstream, *id*. at 748, 763;

- Saenz's explanation for using a syringe to prepare the bleach solution could have been discredited and the jury could have rationally considered her drawing the bleach with a syringe as circumstantial evidence to support the eyewitness testimony, *id*. at 751;

- Saenz was the first to mention bleach as a potential cause of the patient injuries, *id*.;

- Hall's and Hamilton's versions of the events, although slightly different, were reconcilable; the jury could have also disregarded Hamilton's and not Hall's testimony, *id*. at 750; and

- The internet searches were circumstantial evidence of Saenz's guilt, *id*. at 751–52.

Because these conclusions and factual analyses were uncontested in Saenz's petition for discretionary review, we consider them in our harm analysis. *See Swearingen*, 424 S.W.3d at 36–38.

### 2. *Jury Verdict on Aggravated Assault Charges*

We also have the benefit of the jury's verdict. The jury returned three guilty verdicts and two not-guilty verdicts on the aggravated assault charges. An understanding of the facts in relation to each individual victim, specifically the evidence linking Saenz to each victim, the scientific evidence, and other circumstantial evidence, is also helpful. We analyze the evidence supporting each of these verdicts, and how this evidence is applicable to the jury charge. In doing so, we can better relate the evidence to each of the victims alleged in the capital murder charge and determine whether the trial court's erroneous jury charge affected the jury's verdict. *See Ovalle*, 13 S.W.3d at 787.

We thus turn to the jury's verdicts on the five aggravated assault counts, looking specifically at how the evidence of Saenz's guilt varies between the different victims. The jury returned the following verdicts:

- Guilty on Aggravated Assault Counts I (Rhone), III (Oates), and V (Bradley)
- Not Guilty on Aggravated Assault Counts II (Risinger) and IV (Castañeda)

Although the verdicts are not facially distinguishable, the facts underlying the allegations are clearly discernable. We consider Saenz's access to each of the patients, the individual symptomology evidenced by each patient, and any other surrounding facts.

Like other cases with conflicting testimony, the jury alone determines the weight and credibility of the witnesses and their testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Here, Saenz's version of the events differed greatly from the testimony of many of her peers and the State's experts. We begin with the question of differences in Saenz's access to each of the aggravated assault victims.

### a. Saenz's Access to each Victim

The testimony supported Saenz had direct contact, immediately prior to each victim's symptons, with Rhone, Oates, and Bradley, the three aggravated assault victims for whom Saenz was convicted. As to Rhone, Saenz monitored Rhone while her patient care technician was on break. Saenz also acknowledged injecting "saline" into Rhone's IV line. Oates, on the other hand, received medications from Saenz. Saenz charted administering medications to Oates and another patient witnessed Saenz inject something in Oates' IV line and then dispose of the syringe in the sharps' container. Saenz also charted administering medication to Bradley on the day in question. For each of these patients, Saenz either verbally acknowledged, or personally charted, administering medications on the day of their injuries.

In contrast, the evidence to support direct contact between Saenz and the two victims for which Saenz was acquitted was significantly less. Castañeda's testimony before the jury was somewhat confusing. Castañeda was plagued by memory losses and could not remember Saenz actually administering medications to her on the day in question. Similarly, although Saenz was at the facility when Risinger became ill, and another patient reported seeing Saenz inject Risinger, Risinger's patient care technician did not remember taking a break or asking Saenz to cover her patient for any reason.

        b.      <u>Symptomology</u>

The symptomology exhibited by Rhone, Oates, and Bradley was also similar. All three patients reported feeling poorly and experienced sudden, dramatic drops in their blood pressure. Additionally, all three patients were taken to the hospital and tested positive for the 3-chlorotyrosine biomarker and elevated LDH levels. For both Rhone and Bradley, their dialysis lines tested positive for bleach. Oates's dialysis line was not tested.

Once again, Castañeda's and Risinger's symptomology differs from the other three patients' symptomologies. Although Risinger experienced a drop in her blood pressure, she recovered quickly and refused further treatment at a hospital facility. Because she was never seen at the emergency room, no blood tests were conducted and thus there was no scientific link between Risinger's blood content and any injections of bleach. Additionally, Risinger's dialysis lines were not preserved for testing. With regard to Castañeda, although she lost consciousness at the dialysis facility, there was some question as to whether she choked on gum she was chewing. Moreover, even though the paramedics did not remember anything blocking Castañeda's airway, the medical records documented chewing gum was removed from Castañeda's airway. Castañeda remained at the hospital diagnosed with pneumonia. In fact, during testimony at trial, Castañeda explained that prior to her treatment on the day in question, she had already been diagnosed with

pneumonia and described the incident as "merely losing consciousness." Castañeda's dialysis line was also inconclusive for the presence of bleach.

### c. Understanding the Distinctions

Contrary to Saenz's assertion, the jury decision to acquit Saenz as to Castañeda and Risinger does not necessarily mean the jury discredited the scientific evidence. Instead, the jury could have relied on other factual differences to reach different findings. For the counts on which the jury found Saenz guilty, Saenz had direct contact with each of the victims (i.e., Rhone, Oates, and Bradley) on the day in question, the victims' blood tests showed elevated levels of LDH and/or tested positive for the 3-chlorotyrosine biomarker, and all three victims suffered extreme drops in blood pressure. Most importantly, there were no other explanations for their symptoms.

The evidence pertaining to the two not guilty counts, on the other hand, is readily distinguishable. First, Castañeda testified her incident was the result of previously diagnosed pneumonia and the medical reports clearly suggested a blocked airway was potentially responsible for her loss of consciousness. For Risinger, absent the patient report of administering medication, there was no documented contact showing Saenz providing medical care to Risinger. Additionally, no bloodwork was conducted and Risinger's dialysis lines were not preserved for testing.

We presume the jury adhered to their oaths and followed the trial court's jury charge. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) ("We generally presume the jury follows the trial court's instructions in the manner presented."); *accord Jones v. State*, 264 S.W.3d 26, 29 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Here, the jury could have reasonably believed all five patients were injured by injection of sodium hypochlorite or bleach into their dialysis lines as the State alleged. The jury could have also determined the State proved their cases of aggravated assault beyond a reasonable doubt with regard to Rhone, Oates, and Bradley, as there was no other explanation for their injuries. For both Castañeda and Risinger, however, the jury

could have determined the State failed to prove their aggravated assault cases beyond a reasonable doubt because the factual differences raised reasonable doubts on which a rational jury could acquit.

Taking into consideration our uncontested conclusions and factual analysis of the aggravated assault jury determinations, specifically victims with whom Saenz had contact versus those she did not, and victims for whom the State presented scientific evidence supporting bleach poisoning, we now turn to the similarities and differences in the evidence regarding the five victims alleged in Count VI—the capital murder charge.

## C. Capital Murder Charge

Each of the five patients who died during the month of April 2008 while receiving dialysis treatments at the DaVita dialysis center was in end-stage renal failure. Clara Strange and Thelma Metcalf both suffered cardiac arrest during their treatments on April 1, 2008, and died the same day. Similarly, Opal Few was found unresponsive during treatment on April 26, 2008, and died later that day at the hospital. Two of the victims, Garlin Kelley and Cora Bryant, suffered cardiac arrest during treatment and were transferred to the hospital. Kelley survived for two days and Bryant survived for almost three month before each died at the hospital.

### 1. Saenz's Access to the Victims

Saenz had direct contact with all five deceased patients. Saenz monitored Strange while her patient care technician was on break. Strange was unresponsive when the patient care technician returned. Approximately thirty minutes later, Metcalf, who was assigned to Saenz on the day in question, suffered cardiac arrest and never regained consciousness. Two weeks later, Kelley was under Saenz's nursing care, when his patient care technician heard the dialysis machine alarm and saw Saenz standing near an unresponsive Kelley. Saenz stated she was preparing to turn the alarm off and reset the machine. On April 22, 2008, Bryant's assigned patient care

technician was on break when Bryant's alarm sounded. Another nurse witnessed Saenz attempting to reset Bryant's machine. Four days later, while Few's nurse was preparing her medications, Few's alarm sounded and she suffered cardiac arrest. The medical charts confirmed, and Saenz also acknowledged, Saenz administered medication to Few shortly before her cardiac arrest.

### 2. *Symptomology*

Like the three aggravated assault victims for which the jury convicted Saenz, all five capital murder victims became unresponsive and suffered cardiac arrest during their treatments. In three of the patients, Strange, Metcalf, and Bryant, the dialysis machine's blood flow rate was lowered. An expert witness explained that a person can reduce the likelihood of the dialysis machine alarming by turning down the patient blood flow rate.

### 3. *Evidence of Bleach*

The dialysis lines for all five patients were tested for the presence of bleach. In all but Bryant's dialysis lines, bleach was detected. Contrary to Saenz's claims, the testimony substantiated that the bleach did not enter the dialysis process through either the city water or DaVita's filtered water.

Although Saenz testified she used a syringe to ensure accuracy and to precisely follow procedures, the uncontested proper protocol was to use small medicine cups to measure the bleach. If Saenz's concern was truly a question of following protocol and being accurate, the jurors could have easily determined using a syringe was not logical. Saenz claimed that because the needle would not reach the bleach in the bottle, she had to pour the bleach into one container, i.e. a bottle cap, draw it up with a syringe, express it into a second container, and then mix the bleach with water. Additionally, extracting bleach directly from the bleach bottle with the syringe would be practical only if the bottle was nearly full.

Kelley and Bryant were the only patients that survived long enough to be transported and treated at the hospital. As a result, only their blood was tested for the 3-chlorotyrosine biomarker. Both tests were positive confirming exposure to bleach in the bloodstream. One expert testified the levels of chlorotyrosine were the highest levels he had ever seen reported in literature—300 to 400 times greater than what would be expected from the levels that would be naturally produced by a person undergoing dialysis.

Although Bryant's dialysis line did not test positive for bleach, her blood sample showed an elevated level of LDH. The jury heard testimony her level was twenty to seventy times higher than what would be expected from the levels naturally produced by a patient who had experienced cardiac arrest.

Finally, a physician and toxicologist with the Centers for Disease Control, Dr. Mark Schwartz, concluded each capital murder victim died from the injection of bleach into his or her dialysis line or port. He further explained that it is impossible to measure the amount of bleach or sodium hypochlorite in a person's blood. The bleach reacts too quickly, converting to hypochlorous acid which damages the patient's organs and tissues. In addition to Dr. Schwartz's testimony, the jury heard from Dr. Imran Nazeer who testified, in his twelve years as a nephrologist, only two patients had died while undergoing dialysis treatment. Dr. Nazeer also testified regarding a recent study finding the chance of having a cardiac arrest during dialysis treatment was "very rare"—a 0.007% chance.

### 4. Other Circumstantial Evidence

In addition to the scientific evidence presented, the jury heard copious testimony relating to circumstantial evidence of Saenz's guilt.

Less than twenty-four hours after Strange and Metcalf died, Saenz was searching the internet for "bleach poisoning." After the officials began to suspect bleach was involved in the

deaths, Saenz again turned to the internet searching for "bleach given during dialysis," "can bleach be detected in dialysis lines," and "dialysis patients symptoms of bleach infusion."

Saenz also made several incriminating statements. On April 29, 2008, the day after the clinic was closed, and prior to any real investigation, Saenz appeared despondent and told Werlan Guillory that "she didn't kill those people." During her interview with officers later that same day, Saenz was the first to mention bleach poisoning. In her disjointed statement, Saenz averred she was "scared" to go to work "'cause I don't want to kill somebody." Saenz also acknowledged using a syringe to measure bleach when measuring cups were allegedly not available because she was nervous and wanted to follow procedures precisely.

During her testimony before the grand jury, Saenz described herself as a "scapegoat." She blamed DaVita for failing to take actions to prevent the injuries. Saenz also provided extensive detail about medications she administered and how she would prepare the bleach mixture including pouring the bleach "in the cap and draw[ing] it with a syringe."

The jury also heard other evidence of Saenz's behaviors around these patients. Nurse Sharon Dearmon testified Kelley was unresponsive when Saenz attempted to reset Kelley's machine. Dearmon also reported seeing "a large black clot" in the arterial chamber of Kelley's dialysis machine. Strange's nurse, Werlan Guillory, testified that when he notified Saenz of Strange's condition, "it was like she really didn't care."

The jury could have reasonably believed the State proved their capital murder case beyond a reasonable doubt because there is evidence that any one of the five patients who died during the month of April died as a result of Saenz's actions, and those deaths were aggravated by the death of another victim—albeit the jury charge did not specify which specific murder served as the predicate murder. With this in mind, we turn whether the error in the jury charge caused egregious harm.

## CONCLUSION

Although we agree both the trial court's jury charge and the prosecutor's closing argument emphasized, rather than ameliorated, the error in the court's charge, these are only two of the four factors to consider. *See Almanza*, 686 S.W.2d at 171. We must also consider the other two factors in evaluating whether actual, egregious harm occurred: the state of the evidence and the record as a whole support a finding of actual, egregious harm. *Id.*; *Cosio*, 353 S.W.3d at 777. Although Saenz argues this is a question of highly contested evidence like in *Ngo*, we disagree. The evidence adduced at trial, and this court's analysis thereof and conclusions therefrom were not contested by Saenz in the petition for discretionary review she filed with the Court of Criminal Appeals. *Cf. Ngo*, 175 S.W.3d at 750.

Because the jury found Saenz guilty in Counts I, III, and V (aggravated assaults of Rhone, Oates, and Bradley) and not guilty in Counts II and IV (aggravated assaults of Castañeda and Risinger), a review of the evidence overwhelmingly supports that the jury placed significant weight on (1) Saenz's access to the victims, (2) her acknowledged use of a syringe to measure bleach, (3) the existence of bleach in the dialysis line, (4) the 3-chlorotyrosine biomarker, and (5) the testing for elevated LDH. In finding Saenz guilty on three aggravated assault charges, the jury necessarily found the evidence credible and rejected Saenz's assertions of innocence and the various defensive theories she asserted. *See Bell v. State*, No. 05-13-01616-CR, 2015 WL 1648001, at *4 (Tex. App.—Dallas Apr. 10, 2015, pet. filed). This court concluded the evidence reasonably supported the jury's determination of guilt and that holding was uncontested.

Given these conclusions, the record contains no support that the jurors would have believed that Saenz committed only the murder of one of the five victims and not the other four. For all five capital murder victims, there were factual similarities: Saenz was present at each of their treatments and the victims were found unresponsive shortly after Saenz's contact with them.

Additionally, all five victims had *at least one* scientific test supporting bleach poisoning—positive test for bleach in the dialysis line or syringe, a positive test for the 3-chlorotyrosine biomarker, or an elevated LDH.

The State's entire case rested on Saenz injecting each of the victims with bleach which caused either serious bodily injury or death. There was no other manner and means alleged. Saenz's defense was an all or nothing—she did not do *anything* to harm *any* of the victims. Thus, because each of the five murders was based on similar factual situations and the jury rejected Saenz's ultimate defense, the record substantiates the jurors believed Saenz committed the murder of all five victims.

As the Court of Criminal Appeals explained, the trial court's jury charge did not require the jury to unanimously agree "on any one specific murder, which would have served as the predicate murder." *Saenz*, 451 S.W.3d at 392. Here, the record clearly supports that any of the five victims could have served as the predicate murder. We thus conclude the evidence overwhelmingly creates unanimity in the predicate murder and did not affect the jury's verdict. *See Ovalle*, 13 S.W.3d at 787. Like the court in *Cosio*, we conclude that "[o]n this record, therefore, it is logical to suppose that the jury unanimously agreed that [Saenz] committed all of the separate instances of criminal conduct during each of the [five] incidents." 353 S.W.3d at 778. We similarly conclude the evidence supports "the jury's verdicts [on the five victims alleged in Count VI] were, in fact, unanimous." *Id*.

The mere existence of conflicting testimony surrounding a contested issue does not necessarily trigger a finding of egregious harm. *See Olivas v. State*, 202 S.W.3d 137, 148–49 (Tex. Crim. App. 2006) (suggesting that contested evidence may, but does not necessarily, give rise to finding of egregious harm). To warrant reversal, the record must show actual rather than theoretical harm. *See Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013).

- 23 -

As a result, we conclude that the state of the evidence in this case, and the entirety of the record, weigh heavily against a finding of actual harm.  *See Arrington*, 451 S.W.3d at 842, 844 (jury's rejection of defendant's categorical denial of all accusations weighed against a finding of egregious harm in connection with the lack of a unanimity instruction); *see also Nava*, 415 S.W.3d at 298.  We, therefore, cannot conclude the omission of a unanimity instruction affected the very basis of the case, deprived Saenz of the valuable right of a unanimous verdict, or vitally affected her defensive theory so as to deprive her of a fair trial.  *See Allen*, 253 S.W.3d at 264; *Fulcher*, 274 S.W.3d at 716.  Accordingly, because we do not find the record establishes actual, egregious harm as a result of the error in the jury charge, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

PUBLISH