# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00044-CR

---

**Alberto Torres, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 450TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-21-904038, THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING

---

## O P I N I O N

Alberto Torres was convicted of capital murder for killing Jerry Lee by shooting him in the course of committing or attempting to commit robbery and sentenced to life imprisonment. *See* Tex. Penal Code §§ 12.31, 19.03(a)(2). In two issues on appeal, Torres contends that errors in the jury charge require reversal of his conviction. We will affirm the trial court's judgment of conviction.

## BACKGROUND

On November 6, 2020, two Apple Leasing employees in Austin, Texas, called 911 to report a shooting. One employee, Ronnie Kramer, told the 911 operator that at least two perpetrators were trying to steal a truck from the car dealership and that one offender had assaulted his co-worker (Lee) as part of the plan to steal the truck. Kramer related that someone shot at him when he went to help Lee and that he returned fire. Additionally, Kramer stated that

despite his shooting at the offender, the offender kept charging at him. Later in the call, Kramer related that the two offenders were trying to leave in a Lexus SUV.

The other employee, Darrell Wayne As-Salaam, stated in his 911 call that someone had been shooting while at the dealership and that men at the dealership were trying to kill the employees, including him. As-Salaam related that one of the employees started shooting at one of the offenders and that at least one offender had a gun. Further, As-Salaam explained that one of the offenders ran at him and acted crazy. As-Salaam told the 911 operator that he had left the property and would wait for the police at a nearby location.

After 911 relayed the information to first responders, police officers, firefighters, and emergency medical services ("EMS") providers responded to the dealership. The first officer on the scene found Lee's body on the side of the office building. Lee had been shot, was unresponsive, and was lying face down on the concrete. While checking on Lee, the officer noticed on the driveway two individuals inside a black Lexus SUV trying to drive off the property. The officer moved closer to the SUV's passenger side and stood in the SUV's path to prevent the vehicle from leaving, while another officer approached the vehicle from the driver's side and ordered the driver to get out of the vehicle. The driver identified himself as Torres, complied with the officer's directive, admitted that he had a gun in the vehicle, said that someone shot at him, admitted that he shot at the person, and had blood on his t-shirt. The officer found the gun while placing Torres in handcuffs and believed it was a 9-millimeter pistol. Torres was taken to a nearby hospital for treatment for two gunshot wounds.

Contemporaneously, other officers arrived and assisted the first officer in placing in handcuffs the passenger who was later identified as Modesto Hernandez. While searching Hernandez incident to arrest, the first officer discovered a key fob in Hernandez's pocket. Once

2

Hernandez and Torres were secured, the first officer and other officers, firefighters, and EMS personnel went to treat Lee. Despite their efforts to revive Lee, Lee was pronounced dead at the scene. The first officer found a cell phone near Lee's body and later went to the office building to talk with Kramer. After talking with Kramer, the officer clicked the key fob found in Hernandez's pocket and discovered that it was for a Lincoln Navigator in the dealership lot. The Lincoln had an Apple Leasing license plate. Inside the Lincoln was a chainsaw, a water bottle, laundry detergent, and a black backpack with a loaded gun magazine with 9-millimeter ammunition.

While on scene, the investigating officers noticed that the dealership had four security cameras and asked the individual who installed the cameras to play back the footage and make copies of it. The surveillance footage from different locations captured the following events:

As-Salaam working on vehicles on the back side of the building, including working on a black Lexus SUV;

Lee walking around the property;

Torres and Hernandez entering the dealership in a gold Toyota Camry;

Torres parking the car in front of and near a Lincoln Navigator;

Torres and Hernandez getting out of their car and inspecting the Lincoln;

Lee meeting the duo in the parking lot as they were heading toward the office;

Lee walking back to the office to retrieve the key fob for the Lincoln, and the trio walking to the Lincoln;

Lee unlocking the Lincoln, and Torres getting in the driver's seat;

Hernandez walking back and forth between the gold Camry and the Lincoln, seemingly transporting items to the Lincoln;

The driver's door on the Lincoln shaking before Torres and Lee get into a

3

physical conflict;

Lee attempting to get away from Torres who continued to try and punch Lee;

Torres returning to the Lincoln and getting in the driver's seat;

Lee talking on his phone;

Lee walking back to the Lincoln;

Torres standing up on the driver's door frame of the Lincoln with his body coming out of the open doorway and punching Lee from above;

Hernandez continuing to make small trips between the two vehicles;

Kramer running out of the office and pulling a gun out of his pocket;

Torres closing the Lincoln's door behind him before charging toward Kramer on foot as Kramer shoots his gun;

Torres tripping, getting back up, and advancing at Kramer;

Kramer running away from Torres as Torres alternates running and walking toward Kramer, and Kramer shooting at Torres again;

Lee walking away from Torres by going on the opposite side of the property from where Kramer was running;

Kramer running around the building trying to get away from Torres;

As-Salaam reversing a black Lexus on the back of the property before seeing the fighting and hearing the shooting, driving quickly a short distance away after the shooting, stopping the vehicle, and running off the property;

Torres walking back in the direction of the gold Camry;

Hernandez retrieving a gun from the gold Camry and handing the gun to Torres;

Torres turning around towards Lee and pursuing him;

Kramer entering the building;

Lee running past the entrance, dropping his cell phone before picking it up, and tripping and falling forward while running away from Torres;

Torres running up to Lee while Lee was on the ground, aiming the gun at Lee, and shooting Lee while he was on the ground;

4

Torres continuing to walk around the building before heading toward the Lincoln;

Torres and Hernandez making multiple trips between the gold Camry and the Lincoln while carrying different objects;

Torres briefly dancing in the parking lot;

Torres driving the gold Camry a few feet forward to where it was no longer in front of the Lincoln;

Torres walking towards the building, discovering that the door to the Lexus SUV was unlocked, getting inside the SUV, and driving the SUV back to where Hernandez was;

Hernandez getting in the SUV, and Torres driving the Lexus over to the driveway and turning on the blinker, indicating that he was going to turn onto the roadway that had heavy traffic at the time; and

Police officers arriving less than one minute later and detaining the SUV's occupants.

After the police conducted their investigation, Torres was charged with capital murder. During the trial, the State called as witnesses the individual who installed the security system at Apple Leasing; Kramer; As-Salaam; two of the police officers who responded to the 911 calls; the lead investigator; an emergency medical technician, who testified that Lee was pronounced dead at the scene; two crime scene specialists, who testified about the scene and items recovered from the Lincoln; Lee's wife; and the medical examiner. The medical examiner performed the autopsy on Lee and determined that Lee died from a gunshot wound caused by a bullet entering the left side of his back, lacerating a carotid artery and a jugular vein, causing blood to pool in the chest cavity, and exiting near his chin. In addition, the surveillance footage summarized above was published to the jury as well as footage from the responding officers' body cameras.

5

Kramer testified consistently with the surveillance footage but also stated that he was mistaken when he told the 911 operator that Torres had shot at him and had since learned that Torres did not have a weapon until after Kramer finished firing. Further, Kramer related that he went outside with his weapon after receiving a call from Lee asking for help and saying that someone was trying to steal a truck. Kramer described his weapon as a .380 pistol. Next, As-Salaam described the events he observed as described in his 911 call and testified that he left the key fob to the Lexus inside the vehicle when he left the property.

The lead investigator explained that the police found four .380 shell casings that were likely ejected from Kramer's gun and one 9-millimeter shell casing that was likely part of the bullet expelled from Torres's gun. The investigator related that he reviewed the surveillance footage and that the footage showed that when Lee was able to get away from Torres after the first assault, he used his cell phone to make a phone call. The investigator testified that the call history for Kramer's phone established that Lee called Kramer at that point. Regarding the shooting of Lee, the investigator testified that Torres caught up to Lee when Lee fell on the ground, pointed the gun at Lee, and shot Lee in the back. Next, the investigator explained that Torres returned to the Lincoln, that Torres and Hernandez proceeded to transfer objects from the gold Camry to the Lincoln for several minutes, and that Torres danced in the parking lot after having killed Lee. The investigator related that Torres and Hernandez were in the parking lot for ten minutes, that the gun recovered from the Lexus was the one used to shoot Lee, and that the gun was a deadly weapon. Although the investigator related that Torres and Hernandez seemed to be attempting to leave the parking lot when the police arrived, they never left the parking lot and were compliant when taken into custody. Further, the investigator explained that Torres did not have a weapon on him when Kramer fired at him.

In his case-in-chief, Torres elected to testify and stated that he went to Apple Leasing to get information about renting a car or truck because he had to leave town for an emergency. Torres related that he was interested in the Lincoln, that Lee unlocked the Lincoln after retrieving the key fob, that he got in the vehicle, and that Lee abruptly told him to "get out" and asked for the key fob back. Torres testified that Lee grabbed him by the neck and started hitting him without any explanation. Torres described feeling afraid and reasoned that he had to defend himself by hitting Lee. Additionally, Torres stated that an employee appeared with a gun, that he walked towards the employee rather than turn his back because he was afraid the employee would kill him, that the employee shot at him, and that he tried to take the gun away from the employee. Further, Torres testified that the employee shot two rounds of bullets and hit him once during each round.

Torres explained that Hernandez retrieved Torres's pistol from the gold Camry, that Hernandez handed him the weapon after the employee shot at him, and that he needed the weapon to defend himself. Additionally, he stated that after obtaining his weapon, he saw Lee running and saw Lee grab a weapon off the ground. Moreover, Torres related that he followed Lee because he wanted to stop Lee from fleeing the scene. Although Torres acknowledged that he could have left the scene, that Lee was trying to get away from him, and that Lee never shot at him, he explained that he did not think of leaving at the time, was losing blood, and did not have "time to react and act reasonably." Torres stated that he shot Lee when Lee was turning around, explained that he believed Lee had a weapon, and admitted that he has now learned that Lee had a cell phone rather than a weapon. Next, Torres explained that he went to his Gold Camry to leave and seek help for his injuries, that he got into his car, that his car would not start, and that

7

he got in the Lexus after discovering that his car had stopped working. Torres did not remember dancing in the parking lot but surmised he "wasn't in [his] five senses" at the time.

In his cross-examination, Torres admitted that he intentionally shot Lee and pulled the trigger but stated that he did not think Lee would die and had no intent to kill. Torres admitted that he shot Lee in the back while Lee was trying to run away from him. Torres acknowledged that Hernandez was moving objects into the Lincoln before Lee was shot. Although Torres claimed his car stopped working, he acknowledged that it had been working fine before he went to the dealership. Moreover, Torres agreed that he did not call the police for help but stated that he did not know where his phone was.

After considering the evidence, the jury found Torres guilty of the offense of capital murder.

## STANDARD OF REVIEW AND GOVERNING LAW

Under the relevant statutory provision, an individual commits capital murder if he commits murder and "intentionally commits the murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code § 19.03(a)(2). "Capital murder," as charged in this case, "is a 'result of conduct' offense." *Turner v. State*, 805 S.W.2d 423, 430 (Tex. Crim. App. 1991). In other words, "[c]apital murder is defined in terms of one's intent to produce a specified result." *Id.* "Not only must the accused be found to have intended to engage in the act that caused the death, he also must have specifically intended that death result from that conduct." *Id.*

In both of his issues, Torres contends that there were errors in the portions of the jury charge pertaining to capital murder. When preparing a jury charge, a trial court must deliver to the jury a written charge distinctly setting forth the law applicable to the case. Tex. Code

8

Crim. Proc. art. 36.14. Jury instructions must apply the law to the facts adduced at trial and conform to the allegations in the indictment. *Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012). Jury charges contain both an abstract section and an application section. *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012). The abstract paragraphs of a charge "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Id.* The abstract portion does not authorize conviction on its own. *Id.* The application paragraph is the portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the facts and indictment allegations of a given case. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). The application portions allow the jury to convict a defendant of a particular offense. *Crenshaw*, 378 S.W.3d at 466.

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm. *See Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If no objection was made, as in this case, a reversal is warranted only if the error "resulted in 'egregious harm.'" *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

**DISCUSSION**

On appeal, Torres contends that there were errors in the abstract and in the application portions of the jury charge that resulted in his being egregiously harmed. In

9

addressing these issues, we will first determine whether either of the alleged defects constituted error and then determine whether those errors, if any, resulted in egregious harm.

**Errors in the Charge**

In his first issue, Torres argues that there was error in the abstract portion of the jury charge. The jury charge in this case contained instructions regarding the offense of capital murder, the lesser-included offense of murder, and the offenses of robbery and theft. The charge included instructions for the law of parties and self-defense. The abstract section included definitions for intentional, knowing, and reckless mental states. The relevant portions of the abstract section provided as follows:

> A person commits the offense of capital murder if the person intentionally causes the death of an individual and the person intentionally commits the murder in the course of committing or attempting to commit robbery.
>
> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.
>
> . . .
>
> A person commits the offense of robbery if in the course of committing theft as hereinafter defined and with intent to obtain or maintain control of the property, he:
>
> > (1) intentionally, knowingly, or recklessly causes bodily injury to another; or
> >
> > (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.
> >
> > . . .
>
> A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property.
>
> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

10

On appeal, Torres contends that the abstract section of the jury charge contained an erroneous definition for the "intentional" culpable mental state. Although Torres acknowledges that the definition tracks the one given in the Penal Code, *see* Tex. Penal Code § 6.03, he contends that the definition in the charge should have been but was not tailored to the conduct elements of the offense of capital murder. More specifically, Torres argues that capital murder is a "result-of-conduct offense" rather than a "nature-of-conduct offense" and urges that the charge definitions should have been more specifically tailored to result-of-conduct offenses and nature-of-conduct offenses. In response, the State argues that although the charge did not separate the definitions, it "appropriately defined the culpable mental state of 'intentionally' with regard to the conduct elements of capital murder and the aggravating offense, robbery."

We agree with Torres that there was error in the abstract section. As set out above, Torres asserts that there was error because the mental state definitions were not sufficiently tailored in this case. "Section 6.03 of the Texas Penal Code sets out: four culpable mental states—intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *see* Tex. Penal Code § 6.03. When "specific acts are criminalized because of their very nature, a culpable mental state must apply to committing the act itself." *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). "On the other hand, unspecified conduct that is criminalized because of its result requires culpability as to that result." *Id.* "Likewise, where otherwise innocent behavior becomes criminal because of the circumstances under which it is done, a culpable mental state is required as to those surrounding circumstances." *Id.*

11

"[I]ntentional murder is a 'result of conduct' offense." *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). Generally speaking, it is error for a trial court not to limit the definition of a culpable mental state to the result of conduct in an intentional murder case. *See id.* at 491. That general rule is subject to an exception in the context of a capital murder in which the State must prove the result-oriented offense of murder but must also prove an additional offense that contains a nature-of-conduct element. *See Hughes v. State*, 897 S.W.2d 285, 295-96 (Tex. Crim. App. 1994). In that case, it is not error for there to be instructions regarding the result of the offense and regarding the nature of the conduct provided that the nature-of-conduct language is limited to the elements of the offense or offenses that are nature-of-conduct ones. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *see also Hughes*, 897 S.W.2d at 296 n.16 (discussing how charge may appropriately limit culpable mental state).[1]

Here, the State was required to prove that Torres intentionally caused Lee's death through his conduct and that the murder occurred in the context of a robbery, which required proof that Torres committed the robbery in the course of committing theft. *See* Tex. Penal Code §§ 19.03(a)(2), 29.02. Theft includes a nature-of-conduct element. *See id.* § 31.03(a) (defining

---

[1] In *Hughes v. State*, the Court of Criminal Appeals addressed a similar issue and stated that the following type of limiting instructions could be used to avoid the error:

> The following definition applies to mental state in causing death:
>
> A person acts "intentionally" or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
>
> A person acts "knowingly" or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

897 S.W.2d 285, 296 n.16 (Tex. Crim. App. 1994).

theft as "unlawfully appropriat[ing] property with intent to deprive the owner of property"); *Herrera v. State*, 527 S.W.3d 675, 678 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (explaining that unlawful appropriation element of robbery "is a nature-of-conduct element"); *Hughes*, 897 S.W.2d at 295-97 (explaining that elevating offense in capital murder may have nature-of-conduct or nature-of-circumstances element).

For these reasons, it was not error for the trial court to include the nature-of-conduct portions of the intentional definition. *See* Tex. Penal Code § 6.03(a); *Patrick*, 906 S.W.2d at 492. However, it was error not to limit "[t]he nature of the conduct language . . . to the commission of the offense making this a capital murder." *See Whoberry v. State*, 2005 WL 3076927, at *5 (Tex. App.—Austin Nov. 17, 2005, no pet.) (mem. op., not designated for publication) (addressing issue asserting that it was error to include full definition of "intentional" in capital murder case and concluding that it was error to include full definition without limiting applicability of nature-of-conduct portion of definition); *see also* Comm'n on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges Crimes Against Persons and Property* CPCJ 80.9 (2020) (providing instruction for capital murder that person intentionally cause death of individual "if the person has the conscious objective or desire to cause that death").

In his second issue, Torres contends that there was error in the application portion of the jury charge because it failed to include the culpable mental state. The relevant portion of the application section did not include a mental state and instead instructed the jury to find Torres "guilty of the offense of Capital Murder" if it found that he "did then and there . . . cause the death of Jerry Lee with a firearm . . . in the course of committing and attempting to commit the offense of robbery." On appeal, Torres contends the failure to include the culpable mental

13

state in the application section was error.  In its brief, the State does not dispute that the omission was charge error.

Although the State does not argue that there was no error in the jury charge, it does not appear that the omission identified by Torres constituted error.  Torres was charged with the intentional capital murder of Lee, and the abstract section of the charge correctly defined capital murder as occurring when "the person intentionally caused the death of an individual and the person intentionally commits the murder in the course of committing or attempting to commit robbery."  *See* Tex. Penal Code § 19.03(a)(2).   When, as here, "a definition . . . is given in the abstract portion of the charge, the application paragraph must" set out "'all of the conditions to be met before a conviction under such theory is authorized,'" "authorize 'a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers,'" or "'contain[ ] some logically consistent combination of such paragraphs.'"  *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)).

The Court of Criminal Appeals has addressed whether the omission of the appropriate mental state in the application portion was error in a similar, but not identical, situation.  *See Dinkins v. State*, 894 S.W.2d 330, 339-40 (Tex. Crim. App. 1995).  In *Dinkins*, the defendant was charged with capital murder for murdering more than one person.  *Id.*; *see* Tex. Penal Code § 19.03(a)(7).  The abstract section included appropriate definitions for the charged offense and for the offense of murder.  *Dinkins*, 894 S.W.2d at 339 n.5; *see* Tex. Penal Code §§ 19.02(b), .03(a)(7).  Although the application section for capital murder included a culpable mental state for the first murder, it did not do so for the second murder.  *Dinkins*, 894 S.W.2d

14

at 339. However, the application section referred to the second killing as a "murder," which had been correctly defined in the abstract section as intentionally or knowingly causing the death of an individual. *Id.* Accordingly, the Court of Criminal Appeals determined that the jury charge instructed that both killings had to have been committed intentionally or knowingly and that the charge was not defective. *Id.*

As in *Dinkins*, the application portion of the jury charge in this case did not include the mental state regarding the death of an individual and instead directed the jury to consider whether Torres "cause[d] the death of . . . Lee," but that same section of the application section referred to the name of the offense (capital murder) that had been correctly defined in the abstract section as requiring that the offender intentionally cause the death. *Cf. Holland v. State*, 249 S.W.3d 705, 709 (Tex. App.—Beaumont 2008, no pet.) (explaining that "[i]t is unnecessary to repeat every abstract definition in the application paragraph of the jury charge"). Even more, in this case, the application section emphasized that capital murder had a defined meaning by capitalizing both words.

Our reading of *Dinkins* persuades us that the failure to include the word "intentional" in the application section was not error here despite the failure to segregate the nature-of-conduct and result-of-conduct portions of the abstract definition of intentional because the definition of capital murder in the abstract section instructed the jury that the murder had to be intentional and because the application section's inclusion and emphasizing the phrase capital murder keyed the jury to recognize that capital murder had been given a specific meaning. *See Dinkins*, 894 S.W.2d at 340; *see also Farris v. State*, 506 S.W.3d 102, 110 (Tex. App.—Corpus Christ-Edinburg 2016, pet. ref'd) (concluding there was no error under *Dinkins* from omission of complainant's age and area of body defendant intended to touch where abstract defined offense

15

of indecency with child by contact, including age definition of child and prohibited areas of touching, and defined attempt with element of specific intent and where application portion referred to indecency with child by contact); *Caldwell v. State*, 971 S.W.2d 663, 667 (Tex. App.—Dallas 1998, pet. ref'd) (determining that jury charge was not erroneous where application paragraph in capital murder case did not specify that defendant had to solicit murder of more than one person but abstract did). However, even if the omission was error, we would be unable to conclude that Torres was egregiously harmed for the reasons set out below.

**Harm Analysis**

As set out above, Torres did not object to the errors in the jury charge, and for that reason, we review the record to determine if he was egregiously harmed by the errors. "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). "The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm," *Swearingen*, 270 S.W.3d at 813, and "reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm to" the defendant, *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). The determination depends "on the unique circumstances of" each case and "is factual in nature." *Saenz v. State*, 479 S.W.3d 939, 947 (Tex. App.—San Antonio 2015, pet. ref'd); *see Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002) (stating "that egregious harm is a difficult standard" to meet). Neither side has the burden of establishing either the presence or a lack of harm. *See Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). Instead, the reviewing court makes "its own assessment" when evaluating what effect an error had on the

verdict by looking at the record before it. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000) (quoting Wayne R. LaFave & Jerold H. Israel, Criminal Procedure 1165 (2d ed. 1992)).

In this type of analysis, reviewing courts "consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). The analysis is "fact specific and is done on a 'case-by-case basis.'" *Arrington*, 451 S.W.3d at 840 (quoting *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013) (plurality op.)).

*Jury Charge*

In his brief, Torres argues that the entirety of the jury charge supports a conclusion that he was egregiously harmed because nothing in the remainder of the jury charge properly instructed the jury that capital murder is a result-oriented offense and that to properly convict him, the jury had to conclude that he intended the death to occur because of his action. Further, Torres contends that the harm was compounded by the omission of the culpable mental state in the application section.

Although the abstract section did not specify which portion of the intentional definition applied to the murder element of the alleged capital offense, the abstract did provide the following correct definition for capital murder: "A person commits the offense of capital murder if the person intentionally causes the death of an individual and the person intentionally commits the murder in the course of committing or attempting to commit robbery." *See* Tex. Penal Code § 19.03(a)(2). That definition bears upon both errors in the charge by explaining to the jury that the offense of capital murder requires that the offender act intentionally and that capital murder is a result-oriented offense because the actor must intend to cause the death of the victim. *See id.*; *see also Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011)

17

(observing that it is presumed jury followed court's instructions). Accordingly, the definition "served to point the jury to the appropriate part of the definition of intentional," *see Whoberry*, 2005 WL 3076927, at \*5, and directed the jury that a person committing capital murder must act intentionally.

Additionally, the portion of the application paragraph applying the law of self-defense to capital murder similarly directed the jury that capital murder required that Torres intended to kill Lee. Also, the charge included the appropriate mental states for the lesser-included offense of murder in the abstract and application sections. "Common sense would also indicate to most jurors" that if the offense of murder requires that the defendant have a culpable mental state to be guilty, the offense of the more serious offense of capital murder would also require a culpable mental state. *See Gelinas*, 398 S.W.3d at 707. Further, the presence of the correct mental states in the self-defense and murder portions of the charge as well as the simplicity of the error (a one-word omission) likely keyed the jury to conclude that "the inconsistency was the result of a typographical error." *See id.*

Thus, even though the jury charge contained errors in the abstract and application sections regarding the requisite intentional mental state, we conclude that the remainder of the charge served to mitigate the potential for harm and that this factor weighs only slightly in favor of a conclusion of harm. *See id.* (explaining that harm from error in application paragraph can be minimized by inclusion of correct statement of law in abstract section).

*Arguments of Counsel*

In his brief, Torres contends that the second factor weighs in favor of a finding of harm because the State asserted in its closing arguments that he was guilty of capital murder for intentionally shooting Lee without explaining that the law required that he intended to cause

Lee's death. Although Torres acknowledges that his trial attorney correctly informed the jury twice that the law governing capital murder required that the offender intend for the death to occur, he contends that these correct statements of law were insufficient to override the State's incorrect arguments describing capital murder as a nature-of-conduct offense.

Having reviewed the record, we disagree with Torres's characterization of the State's arguments. In the first portion of the State's closing arguments that Torres highlights, the State discussed the mental states in the charge, explained that the knowingly and recklessly mental states applied to the offenses of murder and robbery, and clarified that "as far as capital murder goes," the evidence must show "he intentionally shot [Lee] and caused [Lee]'s death." In other words, the State correctly argued that capital murder required proof that Torres intended both to engage in the conduct resulting in death and to cause the death with that conduct. *Turner*, 805 S.W.2d at 430; *see* Tex. Penal Code § 19.03(a)(2); *see also United States v. X-Citement Video*, 513 U.S. 64, 68 (1994) (noting that mens rea element listed first applies to all verbs following it in list).

In the second portion, the State argued that the evidence established Torres's intent and explained as follows:

> He didn't have to then turn from [Hernandez] and run towards . . . Lee and execute him on the floor. He didn't have to do any of that. He chose to take a weapon and go kill Jerry Lee. That's where your intent comes in. We're going to talk about that. That is intent; when you're running towards a person, you've got a gun in your hand, and he's on the ground in front of you, seemingly in a position where he's on the ground trying to get up, and is shot in the back and the bullet comes out of his chin.
>
> . . .
>
> [Torres] is trying to hurt people. He killed Jerry Lee.
>
> . . .

19

Then what does Alberto Torres do?  Puts a bullet right in the back of Jerry.  And he wants to get -- oh, I didn't mean to kill him.  You didn't mean to kill him, because what was your statement?  "I wanted to stop him from escaping."  Where was he going to go?  He was going to run and tell the cops he was stealing a car, that's where he was going.  He was trying to keep him from escaping to tell anybody his story.  The intent is there.

. . .

[Torres is] dancing while they're loading up the Navigator.  Dancing.  Right after he has murdered somebody.

. . .

Alberto Torres got a gun, hunted Jerry Lee down as he ran away, he executed him.  He executed him by shooting him point-blank in the back.  You want intent?  That is it.

In this portion, like the one above, the State correctly references both the intent to shoot and the intent to kill (or execute as phrased by the State) Lee.  The general discussion of intent carries over to both elements.  Moreover, the State made other arguments regarding intent in other parts of its closing that clarified that it was required to prove that Torres intended to kill Lee and that the evidence established that.  For example, the State emphasized that capital murder occurs when "a person intentionally causes the death of an individual" and that Torres intended to kill Lee as evidenced by his following Lee when Lee was running away.

Given that both the State and Torres's attorney repeatedly emphasized that capital murder required proof that the offender intend to cause the victim's death, *see* Tex. Penal Code § 19.03(a)(2), we conclude that this factor weighs in favor of finding no harm, *see Campbell v. State*, 664 S.W.3d 240, 253 (Tex. Crim. App. 2022) (noting that State's argument "undoubtedly helped to remedy the alleged error in the charge"); *French v. State*, 563 S.W.3d 228, 238 (Tex. Crim. App. 2018) (explaining that State's closing arguments focused jury's attention in way that

20

rendered charge error harmless); *Gelinas*, 398 S.W.3d at 709 (emphasizing "that jury arguments bear significantly on an Almanza analysis").

*State of the Evidence*

Regarding the third factor, Torres emphasizes in his brief the portions of his testimony at trial in which he testified that Lee began assaulting him shortly after they went to the Lincoln Navigator, that he had to defend himself against Lee, that Kramer shot him after he separated from Lee, that Hernandez handed him a pistol to allow him to defend himself, that he saw Lee trying to leave and wanted to stop Lee, that he thought Lee bent down to pick up a gun, that Lee turned around, and that he shot Lee to prevent Lee from escaping. Further, Torres highlights portions of his testimony in which he stated that he intentionally shot Lee but claimed that he did not intend to kill Lee and did not think that Lee would die.

However, ample evidence was presented at trial that would have allowed the jury to reasonably conclude that Torres intended to kill Lee, including, most notably, the surveillance footage. The footage showed an altercation occurring between Torres and Lee, Torres hitting Lee, and Lee trying to get away from Torres. The footage also showed a second altercation after Torres returned to the Lincoln and after Lee returned to the vehicle. Specifically, the footage showed Torres standing on the vehicle's frame and punching Lee who was behind the door. Next, the footage documented Torres charging at Kramer after Kramer appeared and aimed his gun, and the footage chronicled an unarmed Lee walking toward the other side of the office building to get away. Additionally, the footage showed that after Hernandez retrieved a gun from the gold Camry and handed it to Torres, Torres ran towards Lee and aimed the gun in Lee's direction. Further, the footage captured Lee running away from Torres, dropping his phone before grabbing it, and tripping and falling forward, and it showed Torres running up to Lee

21

while he was on the ground, aiming the gun at Lee, and shooting Lee on the ground at close range. *See Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (noting that jury may infer intent to kill from "the use of a deadly weapon").

Regarding the events after the shooting, the footage documented Torres making no effort to help Lee and instead showed Torres moving items from his car to the Lincoln for several minutes, performing a short dance in the parking lot, and attempting to flee the scene in a vehicle that did not belong to him. *See Patrick*, 906 S.W.2d at 487 (explaining that "[i]ntent can be inferred from the acts, words, and conduct of the accused"); *see also Devoe v. State* 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (noting that inference of guilt may be drawn from flight); *Mukherjee v. State*, No. 01-17-00884-CR, 2019 WL 7341673, at *2 (Tex. App.—Houston [1st Dist.] Dec. 31, 2019, pet. ref'd) (mem. op., not designated for publication) (explaining that intent to kill could be inferred from defendant's failure to assist or call for help following shooting, his theft of property, and his flight from scene).

Moreover, the footage from the body camera of the first officer responding to the scene showed Lee lying face down on the ground and bleeding, and the medical examiner testified that Lee was shot in the back and that the wound exited near Lee's chin. *See Patrick*, 906 S.W.2d at 487 (noting that intent can be "inferred from the extent of the injuries"); *see also Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (explaining that evidence that accused shot complainant in back was sufficient to support conviction for assault with intent to murder).

In light of the preceding, we conclude that the state of the evidence weighs in favor of finding that Torres was not egregiously harmed. *See Campbell*, 664 S.W.3d at 252 (noting that state of evidence weighed against finding of harm where "State's case for guilt was

22

exceedingly strong"); *Campbell v. State*, 227 S.W.3d 326, 331 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (determining that defendant was not egregiously harmed by alleged jury-charge error, in part, because "overwhelming weight of the evidence supported the jury's verdict").

*Other Factors in the Record*

Turning to the final factor, other considerations in the record, Torres argues in his brief that nothing else in the record bears upon this issue, but we disagree.

As an initial matter, we note that nothing in the record indicates that the jury was confused by the jury charge. *See Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd) (highlighting that "[t]here is no evidence the jury was confused about the instructions in the charge"); *see also Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet.) (noting that "the jury did not send any notes to the trial court regarding" jury instructions).

Moreover, during voir dire, the State repeatedly explained to the panel that to prove that Torres committed capital murder, it had to show that the murder was intentional and that a reckless or knowing mental state would not suffice. Although the State included the phrase "nature of the result" in its explanation, it also explained that a person acts intentionally when it is his "conscious objective or desire to cause the result." Regarding the charged offense, the State explained that it had to prove that Torres "intentionally committed murder of Jerry Lee by shooting Jerry Lee with a firearm while in the course of committing and attempting to commit the offense of robbery."

For these reasons, we conclude that the fourth factor weighs against a finding of harm. *Cf. Fulcher v. State*, 274 S.W.3d 713, 718 (Tex. App.—San Antonio 2008, pet. ref'd) (noting in case in which application paragraph of jury charge did not include mens rea element,

23

that State informed jury panel during voir dire that it had to prove defendant acted intentionally or knowingly).

Given our resolution of the factors discussed above and assuming that both alleged defects were errors, we conclude that the jury-charge errors did not egregiously harm Torres. *See Arrington*, 451 S.W.3d at 845 (concluding that defendant was not egregiously harmed by jury-charge error where only factor weighing in favor of harm was first one). Accordingly, we overrule Torres's two issues on appeal.

## CONCLUSION

Having overruled Torres's issues on appeal, we affirm the trial court's judgment of conviction.

_____
Thomas J. Baker, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed:   April 25, 2024

Publish

24